David CROCKER, Edward J. Ford, Jr., Kevin Dwight Lewis, and Kenneth Harvey, and all others in Leavenworth United States Penitentiary similarly situated, Plaintiffs,

v.

T. DURKIN, Associate Warden, Michael Crowell, Chaplain, A. Mendez, Lieutenant, E. Ontiveros, Counselor, and Larry Smith, Disciplinary Hearing Officer, Defendants.

No. CIV. A. 98–3157–CM.

United States District Court,
D. Kansas.

July 11, 2001.

David Crocker, Leavenworth, KS, pro se.

Edward J. Ford, Florence, CO, pro se.

Kevin Dwight Lewis, Florence, CO, pro se.

Kenneth Harvey, White Deer, PA, pro se.

Robert A. Olsen, Office of United States Attorney, Kansas City, MO, for defendants

## MEMORANDUM AND ORDER

MURGUIA, District Judge.

### I. Introduction

Plaintiffs, members of the Nation of Islam faith (hereinafter NOI) and inmates incarcerated at the United States Penitentiary in Leavenworth, Kansas (hereinafter USPL), filed this Bivens action on May 18, 1998. Two plaintiffs, Lewis and Ford, have since been transferred to the penitentiary at Florence, Colorado. Plaintiffs allege defendants violated their rights to free exercise of religion, due process, and equal protection pursuant to the First, Fifth and Fourteenth[1] Amendments to the United States Constitution. Plaintiffs sought leave to proceed in forma pauperis, and the court denied those requests. Plaintiffs amended the complaint to include allegations against defendant Smith, the court ordered service of summons, and in due course defendants responded with a motion to dismiss or for summary judgment (Doc. 35). Because the court considers matters outside the pleadings, the motion shall be decided as a motion for summary judgment. Fed.R.Civ.P. 12(b). In addition to defendants' motion, presently before the court are plaintiffs' motions: (1) for extension of time to respond (Doc. 39), (2) for appointment of counsel (with supplemental motion) (Docs.25, 40), (3) to change lead plaintiff (Doc. 43), (4) for an extension of time and to correct clerical mistakes (Doc. 45), and (5) to supplement and correct clerical mistakes (Doc. 47). Plaintiffs' motion for an extension of time to respond to the motion to dismiss (Doc. 39) is granted in the in-

---

1. The court notes that plaintiffs' suit is against agents of the federal government and, therefore, the Fourteenth Amendment does not apply here. Nonetheless, the court must approach Fifth Amendment equal protection claims in the same manner as equal protection claims under the Fourteenth Amendment. *Weinberger v. Wiesenfeld*, 420 U.S. 636, 638 n. 2, 95 S.Ct. 1225, 43 L.Ed.2d 514 (1975).

terests of justice and because it is unopposed.

## II. Facts

In their summary judgment motion, defendants provide numerous facts as to which they contend no genuine issue exists. Plaintiffs, in response, imply numerous issues of fact and provide declarations and attachments, apparently to support the inferences they attempt to raise. In their allegations of facts and arguments, plaintiffs often fail to provide citation to the record to support their allegations of fact as required by D. Kan. Rule 56.1.

Furthermore, plaintiffs assert that their memorandum, "in an effort to less complicate the reading of this [response], ... will address the issues that Plaintiffs are at variance (in disagreement) with defendant by defendant, as not to confuse this Honorable Court." (Pls.' Traverse (hereinafter Response) (Doc. 48) at 16). Plaintiffs then set out by number, and in detail, those statements of fact wherein they disagree with defendants. After reviewing plaintiffs' submissions (including plaintiffs' surreplies (Docs. 58 & 60) and attachments thereto), the court deems admitted defendants' statements of facts not controverted by number in plaintiffs' response.

As required in considering a motion for summary judgment, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

Plaintiffs are followers of the Most Honorable Elijah Muhammad, who founded the NOI. Minister Louis Farrakhan is presently the national leader and teacher of the NOI. NOI members believe in the Holy Qur'an, and follow many of the practices of traditional Muslim groups. Plaintiffs' religious exercises include: Friday Jumah services; fasts, during which participants may not eat after sunrise or before sunset, in the months of Ramadan and December; Muslim feasts such as the Eid–Ul–Fitr and the Eid–Adha; celebration of the Most Honorable Elijah Muhammad's birthday on October 7; celebration of an annual Savior's Day event; and observance of Days of Atonement. In observing their religion, plaintiffs use prayer oil, wear religious medallions, and desire to wear fezzes and bow ties during their religious services.

The Bureau of Prisons (hereinafter BOP) has provided several accommodations for inmates to exercise their religion while incarcerated. The BOP at USPL provides a Chapel, Activities Room, classrooms, and a Sweat Lodge Area for inmates to conduct religious activities. The BOP has a computer-based information management system, called SENTRY, into which certain information concerning inmates is entered and tracked. Information concerning the religious preference of each inmate is entered into SENTRY. The BOP provides an annual budget to the Religious Services Department of USPL to be used in the religious programs at that institution. Expenditures from the budget in support of each religion are made based upon the number of inmates entered into SENTRY in each religious group.

Toward the end of February 1997, prison authorities believed they became aware of a work stoppage planned by some inmates to occur in early March 1997. During the NOI Jumah on Friday, February 28, 1997, prison officials interrupted the service, removed a number of NOI members believed to be involved in the work stoppage, and placed those inmates in the special housing unit (hereinafter SHU). (Pls.' Response, Lewis Decl. at 3, ¶ 9, Har-

vey Decl. at 1, ¶ 3, Letter from Jacques Floyd to Warden True of 4/6/97; Defs.' Mem. in Support of Summ. J. (hereinafter Defs.' Mem.), Doucette–Lunstrum Decl., Attach. 16).

In the summer of 1997, NOI inmates requested to be allowed to wear bow ties at their religious services as is their religious practice. For security reasons, and based upon defendant Chaplain Crowell's recommendation, the warden denied the request. Plaintiffs appealed the denial, and at some point the warden reconsidered and ties were ordered. Ties are to be worn only during NOI religious services, and only by persons with a SENTRY religious preference of NOI. The prison requires that each participant provide his commissary card to the Chaplain before the service, the Chaplain verifies the SENTRY religious preference of the participant, issues the tie if appropriate, and returns the commissary card to the participant when the participant returns the tie to the Chaplain. Defendants imply that the bow ties are available for both Friday Jumah services and Sunday services. (Defs.' Reply, Crowell Supp. Decl., ¶ 28). However, viewed in the light most favorable to plaintiffs, the evidence would establish that they are allowed to wear the bow ties only at Sunday services. (Pls.' Response at 24–25, Crocker Decl. at 5, ¶ 12(1)).

NOI celebrated Savior's Day on October 7, 1997. Defendant Chaplain Crowell provided access to the Activities Room in the morning and the Chapel in the afternoon for authorized participants. For NOI Day of Atonement activities on October 16, 1997, the Chapel was open for prayer from noon to 12:30 p.m. for those who had registered and from 6:00 to 8:00 p.m. for Atonement Services for all interested inmates.[2]

On Friday, November 21, 1997, prison officials interrupted NOI's Friday Jumah and confiscated fezzes from several members of the NOI including plaintiff Ford. The confiscated fezzes bore the initials "F. O. I.," which stands for Fruit of Islam (hereinafter FOI). The BOP considers FOI to be a para-military organization, and fezzes bearing those initials are, therefore, contraband in the prison.

The wife of an NOI inmate runs a bookstore named "The Nubian Exchange" out of her residence in Akron, Ohio. In December 1997, this individual attempted to donate prayer oil to the NOI inmates by sending a package of prayer oil addressed to Chaplain Thuston at the prison. The return address on the package was "Nubian Exchange Bookstore" at the Akron, Ohio address. Mailroom personnel were aware the address was that of an inmate's wife.

At some point prior to receipt of the package at issue, BOP personnel had investigated the "Nubian Exchange Bookstore" and discovered that: the state of Ohio had no record of a bookstore named "Nubian Exchange Bookstore" at the address in Akron, there were no business licenses or tax numbers existing for this business, and the Akron Better Business Bureau and Chamber of Commerce had no records concerning this business. In a follow-up after the incident at issue, on January 14, 1998, mailroom personnel were unable to obtain a telephone listing in

**2.** Plaintiffs attempt to assert that the noon prayer service was supposed to be open to all without pre-registration. (Pls.' Response at 16, ¶ 22) However, the administrative responses cited by plaintiffs indicate that "[t]he Supervisory Chaplain has posted a memoran- dum with instructions for participation in the prayer." (Pls.' Response, "Admin. Remedy," "Response to Inmate Request to Staff Member," 10/15/97; Pls.' Response, "Admin. Remedy," "Response to Inmate Request to Staff Member," 10/3/97).

Akron, Ohio for "Nubian Bookstore." (Pls.' Response, "S.I.S. Report" at 2–3). Plaintiffs present a copy of a Vendor's License dated August 2, 1996 issued by the State of Ohio, Department of Taxation to "The Nubian Exchange." Just below the caption of the license, however, is the statement, "This License must be Renewed Annually at a fee of $10.00." (Pls.' Response, Wilson Decl., attach.) Plaintiffs do not assert, nor do they provide evidence that anyone renewed the license before the attempt to donate prayer oil in December 1997.

When the package was received at the prison, mailroom personnel contacted the supervisory chaplain, defendant Crowell, and informed him about the package. Chaplain Crowell told the mailroom personnel that the Chaplain's Office would accept no packages from the Nubian Bookstore, and the package should be returned to sender. Based upon that information, the package was rejected. (Pls.' Response at 21, Attach. "S.I.S. Report"). When the package was returned to the inmate's wife, she forwarded the wrapping paper to her husband. The wrapper had written on it the words "Rejected per Chaplain Crowell."

Thereafter, plaintiffs Ford, Crocker, and Harvey confronted Chaplain Crowell and asked why the chaplain had violated BOP policy by denying and returning a religious donation of prayer oil without first consulting with the warden to determine whether the warden would approve such a donation. Chaplain Crowell informed the inmates that he had not rejected any oil, nor was

he aware of any oil being donated to the prison. Chaplain Crowell thereupon wrote a memorandum to the investigations section relating the confrontation with inmate Ford. Later that day, plaintiff Ford was placed in the SHU pending investigation of attempting to obtain contraband through the mail.

Plaintiff Crocker complained to defendant Durkin that the NOI was denied photographic film for its Savior's Day celebration even though the request had been approved in the original proposal. Thereafter, on February 26, 1998, plaintiff Crocker was placed in SHU.

On March 7, 1998, plaintiffs assert Chaplain Crowell informed them that NOI members would not be allowed to participate in the Eid–Ul–Fitr and the Eid–Adha. It is unclear what plaintiffs mean by this assertion. In 1998, Eid–Ul–Fitr was celebrated on January 29, over a month **before** the chaplain allegedly refused to allow plaintiffs to participate. Eid–Adha, however, was celebrated on April 7 in 1998, shortly after defendant Crowell allegedly notified the plaintiffs. (Defs.' Mem., Crowell Decl., Attach. 23 at 2). Defendants assert that the refusal was based upon BOP policy which permits participation in only one ceremonial meal annually. Therefore, the court infers that the chaplain refused to allow plaintiffs who had participated in the Eid–Ul–Fitr, or some other ceremonial meal, to participate in the Eid–Adha also.[3]

On Sunday, March 15, 1998, Chaplain Crowell scheduled the African Rastafari-

---

**3.** The court notes that the 1997 NOI ceremonial meal was held on **neither** Eid–Ul–Fitr, February 8, 1997, nor on Eid–Adha, April 17, 1997, but on January 7, 1997. (Defs.' Mem., Crowell Decl., Attach. 23 at 2). Therefore, it is possible that the NOI ceremonial meal in 1998 was on a similar date and the chaplain refused to allow plaintiffs to participate in

either Eid–Ul–Fitr or Eid–Adha in 1998 because plaintiffs had already participated in another ceremonial meal. Neither plaintiffs nor defendants clarify the issue. The court treats plaintiffs allegation as a claim that defendants refused to allow plaintiffs to participate in more than one ceremonial meal in a single year.

ans to use the Chapel for a special holy day during the time that the NOI normally used the Chapel. This was done without advance warning, and when both groups showed up at the Chapel at the scheduled time, Chaplain Crowell offered the NOI the use of the activities room. The chaplain has never cross-scheduled the Christian community with another religious group.[4]

On Mondays from 6:00 to 9:00 p.m., the NOI is regularly scheduled for a service in the activities room. (Defs.' Mem., Crowell Decl., Attach. 17). Viewed in the light most favorable to plaintiffs as nonmovants, the admissible evidence shows that on Monday, April 27, 1998, the NOI had a Study Guide session from 6:00 to approximately 8:00 p.m. At 8:00 p.m. the NOI intended to have a meeting to discuss a possible rap contest apparently to proselytize other inmates and "spread the word of God (Allah) using whatever reasonable forum that one's environment makes readily available." (Pls.' Response at 29; see also Appendix to Pls.' Traverse (Doc. 58) (hereinafter 1 st Surreply) at 14–15). Inmates had placed notices on bulletin boards throughout the prison announcing "**Unity RAP Contest: Auditions: will begin on Monday night (27 April) 8:00 pm–9:00 pm in the Activity Room!**" (1st Surreply, Attach.7). General movement was delayed that night, however, till sometime after 8:00 p.m.

The notices apparently generated considerable attention, but the activity room only has an occupancy load of approximately 30 inmates. At about 8:30 p.m., defendant Mendez observed a large crowd of inmates proceed to the activities room and began to ask a few of the inmates why they were going to the activity room. The inmates responded that they were going to observe a rap contest.[5] Lt. Mendez contacted Chaplain Crowell to determine if the activity was authorized by the Religious Services Department. Chaplain Crowell stated that a rap contest was not authorized and proceeded over to the activity room.

There is a question of fact whether prison officials told NOI members that the meeting could continue so long as no "rap contest" took place. After Chaplain Crowell arrived at the activities room, an NOI member began a rap song. Thereafter, Chaplain Crowell and Lt. Fuentes went into the activities room and told the inmates that the gathering was unauthorized and was being terminated. After dispersing the meeting, prison officials placed the inmate who sang the rap song and plaintiffs Ford and Lewis into SHU for encouraging a group demonstration and refusing to obey an order.

Plaintiff Ford received an Incident Report relating to the meeting and appeared before the Unit Discipline Committee (UDC) on April 30, 1998. The UDC referred the matter to the Discipline Hearing Officer (DHO), and on April 30, plaintiff Ford was given written notice of the

4. Defendants argue that Chaplain Crowell has had to cancel Catholic Mass and Bible study and has moved special NOI Day of Atonement services into the Chapel even though that change required moving another religious group out of the Chapel and into the activities room. However, the documents cited by defendants do not support the assertions made in the supplemental declaration. (Defs.' Reply at 3, Crowell Supp. Decl. at ¶ 11, Attach. 7). Therefore, accepting plaintiffs' assertion,
the court infers that the chaplain has never cross-scheduled Christian groups.

5. Plaintiffs attempt to controvert this fact by showing that the notices state only that auditions will begin on April 27, 1998. Plaintiffs' distinction is a matter of degree. Furthermore, plaintiffs present no evidence that Lt. Mendez **was told** that the inmates were coming to hear **auditions** for a rap contest.

DHO hearing. A hearing was held on May 21, 1998 before the DHO, defendant Smith, and plaintiff Ford was found guilty as charged. Plaintiff Ford timely appealed to the Regional Director and the Central Office. The appeals were denied at each level. Further facts will be discussed as they become relevant.

### III. Miscellaneous Motions

### A. Plaintiffs' Motion to Amend the Complaint (Doc. 47)

On April 17, 2000, plaintiffs filed a "Motion to Supplement to Correct Clerical Mistakes and Omissions" (Doc. 47) (hereinafter Mot. to Amend.) seeking to add language to the amended complaint (Doc. 10). Plaintiffs seek to: include 28 U.S.C. § 1391(e) as a basis for jurisdiction and venue in the District of Kansas, clarify that defendants are being sued in both their official and individual capacities, add a claim for injunctive relief, and add a claim pursuant to the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb et seq. (hereinafter RFRA). Defendants oppose the motion, arguing that it is really a motion to amend rather than a motion to supplement, that amendment is unnecessary and futile, and that plaintiffs failed to follow the proper procedure for amending a complaint pursuant to Fed.R.Civ.P. 15(a) and D. Kan. Rule 15.1.

The court notes that plaintiffs also filed a "Motion for an Enlargement of Time and for an Order to Correct Clerical Mistakes and Omissions" (Doc. 45) on March 16, 2000. It is unclear what plaintiffs seek in Doc. 45. To the extent it may be a motion for an extension of time to file a response to defendants' motion to dismiss or to file plaintiff's motion to amend (Doc.47), the motion is granted as unopposed. To the extent plaintiffs' motion seeks to amend the complaint, the court finds that it is subsumed in plaintiffs' motion to amend

(Doc. 47) and is, therefore, moot. In all other respects, the court finds the motion is meaningless and is, therefore, denied. The court treats plaintiffs' motion to correct clerical mistakes (Doc. 47) as a motion to amend pursuant to Rule 15 and grants the motion ·in part as explained herein.

1. Rule 15 Standard for Motion to Amend

 Because plaintiffs have amended the complaint once, further amendment may be allowed only by leave of the court. Fed.R.Civ.P. 15(a). When justice requires, leave shall be freely given. Id. In determining· whether to deny leave to amend, the court will consider such factors as futility of amendment, undue prejudice to the opposing party, undue delay, bad faith of the moving party, or repeated failures to cure deficiencies by previous amendments. E.g., *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962); *Frank v. U.S. West, Inc.,* 3 F.3d 1357, 1365 (10th Cir.1993); *Seacat v. Mesa Petroleum Co.,* 561 F.Supp. 98, 105 (D.Kan.1983). Furthermore, courts prefer to decide cases on their merits rather than technicalities. *Hardin v. Manitowoc–Forsythe Corp.,* 691 F.2d 449, 456 (10th Cir. 1982). Here, defendants argue that amendment is unnecessary, futile and improperly requested.

2. Discussion

Defendants do not object to venue and, read broadly, the amended complaint includes individual capacity claims against defendants. Therefore, defendants argue, correction to add 28 U.S.C. § 1391(e) to the complaint is unnecessary. The court agrees and will not allow amendment to add the venue statute. However, as discussed below, the court finds that it is proper in the interests of justice to allow amendment to include claims under

RFRA, and consequently, will allow amendment to identify official capacity claims for injunctive relief pursuant to RFRA and individual capacity claims for money damages pursuant to the United States Constitution.

Defendants argue that to allow RFRA claims would be futile because RFRA, at best, would allow only injunctive relief against the United States, or its officials; that an action against an official is, in reality, an action against the United States, and that, therefore RFRA can only establish a basis for suit against the United States and not against individual officials. Furthermore, defendants argue, plaintiffs have failed to allege a substantial interference with a right of free exercise-an essential element of a claim under RFRA. The court disagrees.

Plaintiffs asserted this action against defendants in their official capacity (First Amended Compl. at 2, ¶ 6), and defendants admit that the complaint can be read to assert individual capacity claims. (Defs.' Response to Mot. to Amend at 2). Suits against a government official in his official capacity are, in reality, suits against the government. *Weaver v. United States,* 98 F.3d 518, 520 (10th Cir.1996). Unless the government has waived sovereign immunity, the government official acting in his official capacity is also immune. *Fletcher v. United States,* 116 F.3d 1315, 1325 (10th Cir.1997) (citing *Larson v. Domestic and Foreign Commerce Corp.,* 337 U.S. 682, 689–90, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949)). Therefore, the court does not have jurisdiction over plaintiffs' official capacity claims unless the United States has waived its immunity.

RFRA is a statute in which Congress has unequivocally waived sovereign immunity for the United States. 42 U.S.C.

§§ 2000bb–1 & 2. "A person whose religious exercise has been burdened in violation of this section may assert . . . a claim or defense in a judicial proceeding and obtain appropriate relief against a government." Id. § 2000bb–1(c). "Government" is defined in § 2000bb–2(1) to include an agency, an official, "or other person acting under color of law[ ] of the United States." Therefore, in the interests of justice it is necessary to allow plaintiffs to amend their complaint in order to maintain their official capacity claims.[6]

Defendants' argument that plaintiffs have failed to **allege** a substantial interference with a right of free exercise is without merit.

■ For a governmental action to be a "substantial burden" on religion it must "significantly inhibit or constrain conduct or expression that manifests some central tenet of a prisoner's individual beliefs"; must "meaningfully curtail a prisoner's ability to express adherence to his or her faith"; or must "deny a prisoner reasonable opportunities to engage in those activities that are fundamental" to the prisoner's religion.

*Searles v. Van Bebber,* 993 F.Supp. 1350, 1352 (D.Kan.1998) (quoting *Werner v. McCotter,* 49 F.3d 1476, 1480 (10th Cir. 1995)).

■ By way of example only, plaintiffs **allege** that defendants refused to allow plaintiffs to participate in the Ramadan fast and that all Muslims must participate in that fast. (First Amended Compl. at 5, ¶¶ 35–36). As such, defendants' alleged refusal constrains expression by plaintiffs that manifests a central tenet of plaintiffs' individual beliefs. Therefore, the court finds that plaintiffs have alleged substan-

---

**6.** In a footnote, defendants assert that the constitutionality of RFRA is in doubt in the Tenth Circuit. (Defs.' Response to Mot. to Amend at 3, n. 3). See discussion, infra.

tial interference with free exercise sufficient to justify amending the complaint to include RFRA claims.

Defendants also argue that amendment is improper because the complaint as amended does not specify what type of injunctive relief is requested. However, plaintiffs allege conduct by the defendants based upon continuing policies, practices and actions in violation of plaintiffs' free exercise rights. (First Amended Compl. ¶¶ 21, 23–24, 28, 30, 34, 65, 71, 78, and 84). An injunction is "[a] court order commanding or preventing an action." Black's Law Dictionary 788 (7th ed.1999). Construing the pro se plaintiffs' complaint broadly, the court finds that the injunctive relief sought by plaintiffs is an order prohibiting the defendants from repeating conduct which violates plaintiffs' rights under RFRA.

Defendants do not argue, and the court does not find, bad faith, undue delay, or prejudice to the defendants in the motion to amend. Furthermore, as explained above, the court does not find that amendment would be futile. Therefore, the court will allow plaintiffs' amendment unless it finds that plaintiffs' procedural failings in making the motion to amend are sufficient to justify denial of the motion.

"[A] motion to amend shall set forth a concise statement of the amendment sought to be allowed, with the signed original and one copy of the proposed amended pleading, attached." D. Kan. Rule 15.1. In their motion to amend, on pages two and three, plaintiffs have set forth a concise statement of the amendment sought to be allowed by formatting the language sought to be added to the complaint in **bold and underlined** text. Defendants do not assert that they do not understand the . complaint as amended. Courts prefer to decide issues on the merits rather than to construe technical niceties to preclude resolution on the merits. In this case, plain-tiffs are inmates who appear pro se and who have requested appointment of counsel to assist in their presentation of the case. Although the court finds hereinafter that appointment of counsel is not appropriate in these circumstances, it cannot find that plaintiffs' failure to attach a proposed amended complaint to their motion is such a procedural failing in the circumstances as would justify denial of their motion to amend.

Plaintiffs' motion to amend is granted in part, and the first amended complaint (Doc. 10) is deemed amended as follows. Page three of the first amended complaint (numbered "–2–"), ¶ 6 is amended to read, in its entirety:

6. AWP DURKIN, CHAPLAIN CROWELL, LT. MENDEZ, AND COUNSELOR ONTIVEROS were all operating in concert with one another, and in their official capacities when they violated the constitutional rights of the above-named plaintiffs. As such, these defendants are all being sued each in their official capacity as for injunctive relief, and; Also, all are being sued each in their individual or personal capacity, too; for monetary damages.

Page two of the first amended complaint (numbered "–1–") is amended by adding, at the end of the first paragraph, captioned "I. JURISDICTION AND VENUE," the following sentence: "This civil action complaint is also being filed under the Religious Freedom Restoration Act (R.F.R.A.) 42 U.S.C. § 2000bb et seq., enacted by Congress in 1993."

**B. Motion to Change Lead Plaintiff (Doc. 43)**

█ Plaintiff, David Crocker has made an unopposed motion to substitute plaintiff, Edward J. Ford as the lead plaintiff in this case. This case was filed as a potential class action suit, defining the class only

as "similarly situated Leavenworth prisoners." (First Amended Compl., ¶ 1). Plaintiffs make no showing as to the factors necessary to maintain a class action. Therefore, the court determines that this action shall not be maintained as a class action. Because the court cannot find pursuant to Fed.R.Civ.P. 23(c) that this action can be maintained as a class action, plaintiff Crocker's motion is denied.

Plaintiffs shall continue, as they have so far, as individual plaintiffs without a lead plaintiff.

### C. Motion to Appoint Counsel (Docs.25, 40)

Plaintiffs have made a motion and a supplemental motion for appointment of counsel in which they argue that they are incarcerated in two different institutions, they are without sufficient income or assets to afford to pay counsel, and that the issues and procedures are so complex that they will be prejudiced without counsel to assist them in the presentation of their case.

 There is no constitutional right to appointment of counsel in a civil case. *Durre v. Dempsey*, 869 F.2d 543, 547 (10th Cir.1989). However, "[t]he court may request an attorney to represent any person unable to afford counsel." 28 U.S.C. § 1915(e)(1). In this case, the court has already determined that plaintiffs may not proceed in forma pauperis, and plaintiffs do not assert that they have made any attempt to secure counsel on a contingency fee basis. The court must consider several factors in deciding whether to appoint counsel: (1) the merits of the litigant's claims, (2) the nature of the factual issues raised in the claims, (3) the plaintiffs' ability to present their claims, and (4) the complexity of the legal issues raised. *Rucks v. Boergermann*, 57 F.3d 978, 979 (10th Cir.1995) (citing *Williams v. Meese*, 926 F.2d 994, 996 (10th Cir.1991)).

 Plaintiffs' filings to date indicate that plaintiffs have a firm grasp on the facts and issues in this case, are capable of presenting the case, and have presented their claims adequately. The legal issues, though numerous, are not overly complex and those issues remaining after the court decides the present motion for summary judgment involve only the RFRA. The plaintiffs' filings show an ability to address the facts and issues involved in proving a claim under the RFRA. The fact that the prisoners are incarcerated in two institutions, while cumbersome, will not preclude preparation of the case and would present the same logistics problems to counsel as to plaintiffs. Therefore, the court finds that appointment of counsel is not appropriate in this case.

### IV. Defendants' Motion to Dismiss or for Summary Judgment (Doc. 35)

Defendants have made a motion to dismiss or for summary judgment asserting four separate bases for dismissal. First, pursuant to Fed.R.Civ.P. 12(b)(1) defendants assert the court lacks subject matter jurisdiction over plaintiffs' claims, arguing that defendants' conduct does not rise to the level of a constitutional violation and that the United States has not waived sovereign immunity to justify official capacity claims. Second, pursuant to Rule 12(b)(5) defendants assert the court lacks personal jurisdiction over defendants Durkin, Mendez, and Smith. Third, pursuant to Rule 23 defendants assert failure to meet the requirements for class certification. Finally, pursuant to Rule 12(b)(6) or Rule 56 defendants assert failure to state a claim or argue that no genuine issues of material fact are in dispute and summary

judgment is required in these circumstances.

The court determined above that this matter would not be maintained as a class action. The court reserves ruling on personal jurisdiction as to defendants Durkin, Mendez, and Smith until after defendants respond to the second amended complaint.

Because defendants argued their motion in the alternative as a motion for summary judgment and the court has considered matters outside the pleadings, the court decides defendants' motion as a motion for summary judgment. Fed.R.Civ.P. 12(b). Plaintiffs responded to the motion as a motion for summary judgment and presented declarations, affidavits, and supporting documentation. Therefore, the motion is ripe for decision.

## A. Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Id.* (citing *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505).

The moving party bears the initial burden of demonstrating an absence of a gen-

uine issue of material fact and entitlement to judgment as a matter of law. *Id.* at 670–71. In attempting to meet that standard, a movant that does not bear the burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out a lack of evidence for the other party on an essential element of that party's claim. *Id.* at 671 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505; see *Adler*, 144 F.3d at 671 n. 1 (concerning shifting burdens on summary judgment). The nonmoving party may not simply rest upon its pleadings to satisfy its burden. *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505. Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Adler*, 144 F.3d at 671. "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Id.*

Finally, the court notes that summary judgment is not a "disfavored procedural shortcut," rather, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action." *Celotex*, 477 U.S. at 327, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 1).

## B. Qualified Immunity

■■ Defendants assert that they are entitled to qualified immunity from plaintiffs' constitutional free exercise, equal protection, and due process claims. The burden of pleading the affirmative defense

of qualified immunity rests upon defendants. *Crawford–El v. Britton,* 523 U.S. 574, 587, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998).[7] After defendants plead the defense of qualified immunity, "plaintiff[s] bear[ ] a heavy two-part burden." *Mick v. Brewer,* 76 F.3d 1127, 1134 (10th Cir.1996). Plaintiffs "must show (1) 'that the defendant[s'] actions violated a constitutional or statutory right,' and (2) that the right 'allegedly violated [was] clearly established at the time of the conduct at issue.'" *Id.* (quoting *Albright v. Rodriguez,* 51 F.3d 1531, 1534 (10th Cir.1995)).

■■■ "[P]laintiff[s] must articulate the clearly established constitutional right and the defendant[s'] conduct which violated the right with specificity." *Id.* (quoting *Romero v. Fay,* 45 F.3d 1472, 1475 (10th Cir.1995)). The conduct in question need not have been previously held unconstitutional, but it must be apparent that it is unconstitutional in light of previous law. *Id.* "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Id.* (quoting *Medina v. City and County of Denver,* 960 F.2d 1493, 1498 (10th Cir.1992)).

■■■ "Defendants are entitled to qualified immunity if their conduct was objectively reasonable in the light of clearly established law and the information which the[y] possessed at the time of the alleged violation." *Searles v. Van Bebber,* 993 F.Supp. 1350, 1353 (D.Kan.1998). Evidence of malice or improper motivation does not enter into determination of qualified immunity. Defendants' subjective intent is simply irrelevant to a qualified immunity defense. *Crawford–El,* 523 U.S. at 588, 118 S.Ct. 1584. Furthermore, defendants bear the burden to demonstrate that no material issues of fact exist only **after** plaintiffs carry their two-part burden regarding qualified immunity. *Mick v. Brewer,* 76 F.3d at 1134.

### 1. Free Exercise Claims

Plaintiffs claim that defendants violated their right to free exercise of their religion, that such a right is well established by the Constitution and the law existing at the time of defendants' actions, and that, therefore, defendants do not have qualified immunity from suit. Defendants argue that plaintiffs have failed to establish that defendants' conduct violated clearly established law.

#### i. Failure to Produce Evidence to Establish Claims

■■■ As a preliminary matter, the court finds that plaintiffs have failed to produce admissible evidence to establish a basis for certain claims. Plaintiffs allege that their free exercise rights were violated when: (1) defendant Crowell refused to provide space or allow plaintiffs to serve refreshments for the NOI celebrations of Savior's Day, Feb. 26, 1997, and Elijah Muhammad's birthday, Oct. 7, 1997; (2) defendant Crowell refused to allow plaintiffs to gather and pray on Elijah Muhammad's birthday, Oct. 7, 1997, and Savior's Day, Oct. 16, 1997; (3) defendant Crowell turned away guests from the Savior's Day celebration on Mar. 1, 1998; and (4) defendant Crowell refused to allow NOI members to participate in the traditional Muslim Ramadan. but plaintiffs provide no affidavit

---

**7.** Qualified immunity rules apply equally in suits against state officials under 42 U.S.C. § 1983 and suits alleging constitutional claims against federal officials under Bivens.

*Crawford–El,* 523 U.S. at 587, 118 S.Ct. 1584; *Mick v. Brewer,* 76 F.3d 1127, 1134 n. 4 (10th Cir.1996).

or declaration to support such an assertion.

With regard to allegation (2), it is not clear whether plaintiffs are claiming they were denied any opportunity whatsoever to pray or whether they allege only that defendant Crowell at first refused to allow plaintiffs to pray and the warden later forced defendant Crowell to allow it. Although plaintiffs did not follow the procedures in Rule 56 precisely, they responded to defendants' motion with a memorandum, two surreplies, eleven declarations or affidavits, one supplemental declaration and numerous supporting documents.

The court has reviewed plaintiffs' papers and the record in this case and finds no evidence admissible at trial from which plaintiffs might establish the facts alleged above, and the record is replete with references from which the court might infer plaintiffs were allowed to participate, at least to some extent, in such activities. Plaintiffs have presented no affidavits or declarations which assert these facts. Therefore, the court finds that these claims must be dismissed because plaintiffs have failed to present admissible evidence that such incidents occurred.

### ii. Failure to Show Violation of Clearly Established Constitutional Rights

Plaintiffs argue that the law is clear that prison officials may not substantially burden the free exercise rights of inmates in the absence of a compelling interest, and then only if the burden is the least restrictive means to further that interest. Plaintiffs have presented the correct analysis pursuant to RFRA. *Kikumura,* 242 F.3d at 960–62. However, in 1997 the Supreme Court held RFRA unconstitutional, at least as applied to claims against state government officials. *City of Boerne v. Flores,* 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997). Therefore, the court finds that it was not clearly established that RFRA applied to defendants' conduct at that time.

■■■ The Supreme Court has declared that courts are not to substitute their judgment on matters of institutional administration for the determinations made by prison officials, even when First Amendment claims have been made. See *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 353, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987). Although inmates clearly retain their First Amendment right to the free exercise of religion, incarceration necessarily limits that right. See *id.* at 348, 107 S.Ct. 2400. The burden on the government to defend its action is substantially less demanding when the prima facie constitutional claim has been made by a prisoner challenging prison policy as opposed to a similar claim made by a citizen who is not incarcerated. See *id.* at 349, 107 S.Ct. 2400. Thus "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987).

*Kikumura,* 242 F.3d at 956.

Moreover, in most of their allegations plaintiffs do not allege that defendants refused to allow plaintiffs to engage in the religious activity, but only that defendants interfered in or established conditions upon the exercise of plaintiffs' religious activities. The court will look at each incident in which plaintiffs allege a violation of their free exercise rights.

### a. Jumah Service Interruptions

■■■ Plaintiffs claim defendants violated their rights when defendants interrupted Friday Jumah services on February 28 and November 21, 1997 to remove inmates believed involved in a potential work stoppage and to confiscate fezzes bearing the initials "F.O.I." Plaintiffs do not argue that

the services were stopped for a period of time longer than needed to accomplish the purpose of the interruption or that plaintiffs were not allowed to continue the services after the interruption. Plaintiffs present no authority for the proposition that it is a free exercise violation to interrupt inmate religious services to carry out administrative or disciplinary functions involving participants in the services. Although plaintiffs argue that NOI members were not involved in any planned work stoppage and that "Fruit of Islam" is not a para-military organization, they do not present any admissible evidence from which the court could infer that the stated reasons were merely a pretense to stop the services. The fact of two incidents, nine months apart, does not in itself imply pretext. Lacking such evidence, interruptions of religious services do not rise to the level of constitutional deprivations.

#### b. Censorship of Videos

■ Plaintiffs argue that defendants have refused to provide videos and have censored video presentations of religious material of the NOI. The only evidence plaintiffs present regarding videos might establish that defendant Crowell has released the second part of multi-part videos for viewing before releasing the first part and that prison officials refused to accept one set of two video tapes for donation to the prison chapel library.

Plaintiffs cite no authority that prison officials must review and release religious video materials in order. Nor do plaintiffs present admissible evidence beyond plaintiffs' personal, conclusory opinion that the language of the videos at issue is not inflammatory in a prison setting. Prison officials determined the tapes were incendiary in nature because they contained inflammatory racial language and language derogatory to the prison institution.

(Defs.' Mem., Crowell Decl. ¶ 7, Attach 1). Plaintiffs have failed to meet their burden to establish that defendants' conduct violated clearly established law.

#### c. Rejection of Package

■ The fact that a package mailed from "Nubian Exchange Bookstore" was rejected on the authority of Chaplain Crowell is used by plaintiffs in an attempt to show a free exercise violation. However, nowhere does the record show that any plaintiff did not have prayer oil or was prevented from exercising his religion due to a lack of prayer oil as a result of rejection of the package. Prayer oil is available for purchase at the prison commissary. Plaintiffs do not show that, when defendant Crowell rejected the package, he was aware that it contained prayer oil or that it was intended as a donation.

Plaintiffs present no evidence that "Nubian Exchange Bookstore" was an authorized vendor for religious donations. In fact, the evidence is that prison officials were unable to find any information on the "Nubian Exchange Bookstore." The license presented with plaintiffs' declarations had expired on its face before December 1997, when the package arrived. To the extent that plaintiffs argue inmates of other religions have been allowed to receive donations of prayer oil, such argument may constitute a constitutional equal protection claim of religious discrimination, but does not constitute a First Amendment, free exercise violation. Plaintiffs have failed to show a constitutional deprivation

#### d. SENTRY Religious Preference and Proselytizing

■ Plaintiffs assert violation of their free-exercise rights in that defendant Crowell did not change religious preference in the SENTRY system for every request he received and did not allow inmates with a religious preference other than NOI to

attend Friday Jumah services and other services of the NOI although inmates who did not have a Christian preference were allowed to attend Sunday Christian services. Defendants counter that all plaintiffs have a SENTRY preference of NOI, do not allege that defendant Crowell refused to put their preference into the system, and have no standing to assert a right to a SENTRY entry for any other inmate. Further, defendants argue that a SENTRY religious preference is **always** a prerequisite for attendance at religious services which require accommodations, such as work release, special meals, and so forth, and is **never** a prerequisite for attendance at religious services which do not require accommodation, such as services which take place when the inmate is not working.

With regard to requirement of a SENTRY entry for participation in certain activities, plaintiffs present no evidence of an inmate who did not require accommodation who was refused participation in a NOI service or who was **given an accommodation** to participate in a Christian service although the inmate was not listed as a Christian in SENTRY. For example plaintiffs do not present evidence of an inmate who was not scheduled to work Friday, but was prevented from attending the Jumah service because he was not listed in SENTRY as NOI. Nor do plaintiffs present evidence of an inmate who was permitted to participate in a Christian **ceremonial** meal who was not listed in SENTRY with a Christian religious preference. Plaintiffs have failed to establish a constitutional deprivation. Moreover, plaintiffs have not shown how they would have standing to assert violation of such a person's free exercise rights.

With regard to change of SENTRY religious preference, the court views plaintiffs' claims as an assertion that defendants have violated plaintiffs' free exercise right to proselytize for the NOI. Plaintiffs have standing to assert a violation of this free exercise right. Compare *Anderson v. Salt Lake City Corp.*, 475 F.2d 29, 31 (10th Cir.1973) (legitimate non-economic interest under Free Exercise Clause); with *Harris v. McRae*, 448 U.S. 297, 320, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980) (no personal stake in alleged free exercise violation). Plaintiffs argue that defendant Crowell attempts to keep NOI membership at a minimum and that he interviews those who wish to change religious preference to NOI but not those who wish to change religious preference to Christian. Plaintiffs admit that Chaplain Crowell has a duty to monitor patterns of changes in declarations of religious preference. Plaintiffs do not deny that Crowell has interviewed only those inmates in which multiple requests have been made in the same handwriting. A policy to interview inmates in such cases is consistent with a duty to prevent abuse or coercion of inmates to change religious preference. Such a policy does not prevent plaintiffs from proselytizing for the NOI. Moreover, plaintiffs present no evidence of an inmate that wanted to change his religious preference but was not permitted to do so. Plaintiffs have not met their burden to show facts which might establish a constitutional deprivation.

### e. Photographic Film

■ Plaintiffs assert in a conclusory fashion that Chaplain Crowell refused to provide plaintiffs with photographic film for their Savior's Day activities in early 1998 even though it had been approved in the original proposal. However, plaintiffs do not assert that film is a part of their Savior's Day religious exercise or, if so, how refusal to provide film violated their free exercise right. Again, plaintiffs have not met their burden to show facts which

might establish a constitutional deprivation.

### f. Celebrate Multiple Annual Feasts

■ Plaintiffs argue that defendant Crowell's refusal to allow them to participate in multiple religious feasts annually constitutes a violation of their free exercise rights. Defendants assert that defendant Crowell's refusal to allow multiple feasts annually is based upon BOP policy and plaintiffs assert no authority for the proposition that such a policy was clearly contrary to law in 1998.

BOP Program Statement 5360.07 "Religious Beliefs and Practices" effective August 22, 1997 states at § 548.20(c), pp. 9–10: "The chaplain may arrange for inmate religious groups to have one appropriate ceremonial or commemorative meal each year for their members as identified by the religious preference reflected in the inmate's file. An inmate may attend one religious ceremonial meal in a calendar year." (Defs.' Mem., Crowell Decl., Attach. 9). Prison regulations are presumptively constitutional, and plaintiffs present no authority for the proposition that the regulation was clearly unconstitutional. Furthermore, although plaintiffs argue that the policy is discretionary they provide no evidence other than conclusory, self-serving statements that such discretion exists. Plaintiffs have not shown that refusal to permit multiple feasts annually violated clearly established law.

### g. Cross Scheduling Religious Services

■ Plaintiffs argue that defendant Crowell violated their free exercise rights when he cross-scheduled the chapel on March 15, 1998. Plaintiffs do not show how cross-scheduling interfered with the exercise of their religion. Plaintiffs do not argue that they were unable to hold their services in another location. The fact that defendant Crowell has never cross-scheduled the Christian community with another religious group may raise an equal protection claim of discrimination based upon religion, but does not constitute violation of the constitutional right to free exercise of religion.

### h Use of Religious Services Department Budget

■ Plaintiffs controvert defendants' factual allegations concerning purchases allegedly made out of the religious services department budget for the NOI. However, plaintiffs do not explain in what way defendant Crowell's use of the budget violated their right to free exercise of religion. Plaintiffs argue Crowell failed to purchase the proper kind of Holy Qur'an but do not allege that they do not have access to the Holy Qur'an needed for their use. Plaintiffs argue that Crowell failed to purchase bean pies for a ceremonial meal but do not allege that bean pies are essential to the ceremonial meal. (Pls.' Response at 19 ("each and every one of our (N.O.I.) members were (sic) looking forward to eating one of them")). Plaintiffs have not met their burden to show facts which might establish a constitutional deprivation.

### i. Bow Ties

■ Plaintiffs argue that defendants have violated plaintiffs' free exercise rights by refusing to allow plaintiffs to wear bow ties at their Jumah services and by requiring that each plaintiff check out only one bow tie and surrender his commissary card until the tie is returned. Plaintiffs claim that it is the organizational policy of the NOI to protect information regarding the number of members and that in the Leavenworth penitentiary it is necessary to protect the identity of individual members to preclude undue harassment. Therefore, plaintiffs argue, it is a violation of their free exercise rights not to allow

one individual to check out all of the bow ties.

The court disagrees. In the first place, plaintiffs do not assert that it is a tenet of their religion not to identify the number or identity of participants in their services. Second, ties are to be worn only by persons with a SENTRY religious preference of NOI, and plaintiffs do not assert that placing a religious preference in SENTRY is a violation of their free exercise right. Finally, the mere wearing of a bow tie will identify the wearer as NOI to the extent that no other inmates are allowed to wear bow ties, and other inmates and staff may pass by and observe NOI services.

Further, the prison has an interest in insuring that ties are returned or, if lost, in knowing who was responsible for the loss. If a person checks out several ties, it will be difficult to determine who is directly responsible for any loss or who may have secreted the tie. An individual required to surrender his commissary card for one tie, on the other hand, will be aware that he cannot successfully argue that someone else lost the tie. Plaintiffs have not met their burden to show facts which might establish a constitutional deprivation resulting from a requirement to exchange a commissary card for each tie.

 Prisons are not required to allow inmates to participate in any and all activity which the inmate may claim is based upon religious exercise. *Kikumura*, 242 F.3d at 956 (incarceration necessarily limits right of free exercise) (citing *O'Lone*, 482 U.S. at 353, 107 S.Ct. 2400). Plaintiffs claim that defendants will allow them to wear bow ties at Sunday services but not at Friday Jumah services. Plaintiffs further claim that wearing a bow tie at Friday Jumah services is more important to NOI than at Sunday services. Plaintiffs do not cite, and the court has not found any legal authority, either before 1998 or

now, for the proposition that prison officials must allow NOI members to wear bow ties to any service, including Friday Jumah service. · Nor is it clear from the record in this case that plaintiffs ever explained to defendants that, given a choice of only one service, they would prefer to wear bow ties at Friday Jumah services. The court cannot find that refusal to allow plaintiffs to wear bow ties at Friday Jumah services violated a constitutional right clearly established at the time of the refusal.

### j. "Rap Contest" Incident

 In their effort to establish a constitutional violation, plaintiffs argue that defendants violated their free exercise right when defendants terminated the NOI Study Guide meeting and placed two plaintiffs and one other NOI member into SHU on Monday evening, April 27, 1998. Plaintiffs claim the meeting was terminated because defendants Crowell and Mendez harbored animosity for the NOI in general and plaintiff Ford in particular. Plaintiffs appear to argue that they have the right to engage in **any** activity during their scheduled religious services unless specifically prohibited by prison regulations or by prior notice from institution officials.

The court will assume that inmates might reasonably expect to engage in the usual activities involved in the exercise of their religion during scheduled religious services. The court will further assume that activities aimed at proselytizing others or at promoting harmony among inmates might be considered usual activities involved in the exercise of plaintiffs' religion. Defendants do not argue that plaintiffs may not use rap music in their services. Rather, defendants argue that they believed plaintiffs and others were engaged in a unapproved rap contest, or at least auditions for an unapproved rap con-

test. Defendants argue the unapproved rap contest is why they terminated the activity.

Plaintiffs present no evidence from which the court might infer that defendants should have known plaintiffs were not conducting an unauthorized rap contest or auditions. Plaintiffs admit that inmates had placed notices around the institution announcing auditions for a rap contest to take place that evening in the activities room during time that was scheduled for NOI religious services. The notices represent that the rap contest is presented by the "Inter–Faith Communities of USP. Leavenworth," but do not indicate in any way the involvement of NOI.

Several inmates told defendant Mendez they were going to a rap contest in the activities room. Defendant Mendez knew that the activities room was scheduled to be used for religious services by the NOI. Defendant Mendez checked with the supervisory chaplain of the religious services department, defendant Crowell, and defendant Crowell said that no rap contest had been approved. Plaintiffs admit that the contest had not been approved by the time of the incident on April 27. After speaking to defendant Mendez, defendant Crowell proceeded to the activities room to observe the situation. Lt. Fuentes took inmate J. Derring–Bey to the lieutenant's office and asked about a rap contest. Inmate Derring–Bey responded that " 'I knew of no rap contest that night. This is a Nation of Islam meeting being held in the time slot that had been designed by the Chaplain Dept.' This Lt. told me to return to the meeting and that it (the meeting) could continue." (Pls.' Response, Derring–Bey Decl. at 1, ¶ 3). Defendant Crowell remained in the hall and listened and observed the meeting. Shortly thereafter, a NOI member began a rap song,

and defendant Crowell and other prison officials terminated the meeting.

To a reasonable official in the position of defendants Crowell and Mendez, it would appear that plaintiffs were holding a clandestine rap contest in the guise of holding religious services for the NOI. Plaintiffs do not show that defendants' conduct violated a constitutional right clearly established at the time of the conduct.

### k. Derogatory Comments

■■ Plaintiffs allege defendants made derogatory comments with regard to plaintiffs' religion. However, verbal harassment does not state a cognizable constitutional violation. *McBride v. Deer*, 240 F.3d 1287, 1291 (10th Cir.2001) (taunts and threats are not an Eighth Amendment violation); *Freeman v. Arpaio*, 125 F.3d 732, 738 (9th Cir.1997) (verbal abuse directed at religious and ethnic background); *Mabon v. Campbell*, Nos. 98–5468, 98–5513, 2000 WL 145177, at *2 (6th Cir. Feb.1, 2000) (racial epithets). Furthermore, defendants' subjective intent is simply irrelevant to a qualified immunity defense. *Crawford–El*, 523 U.S. at 588, 118 S.Ct. 1584.

Having reviewed each alleged free exercise violation pursuant to the First Amendment, the court finds that plaintiffs have failed in their burden to show defendants violated a constitutional right that was clearly established at the time of the conduct at issue. Summary judgment is therefore proper as to all free exercise claims.

### iii. Equal Protection Claims

■■ Plaintiffs claim that defendant Crowell has discriminated against them because of their race. Moreover, plaintiffs' free exercise argument is cognizable as a claim that defendants discriminated against them because of their religion. An equal protection violation occurs when the government treats someone differently

than another who is similarly situated. *Penrod v. Zavaras,* 94 F.3d 1399, 1406 (10th Cir.1996); *Williams v. Meese,* 926 F.2d 994, 998 (10th Cir.1991). To prove an equal protection violation plaintiffs have the burden of proving "the existence of purposeful discrimination," *McCleskey v. Kemp,* 481 U.S. 279, 292, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987) (quoting *Whitus v. Georgia,* 385 U.S. 545, 550, 87 S.Ct. 643, 17 L.Ed.2d 599 (1967)), and that the purposeful discrimination "had a discriminatory effect" on them. *Id.* (quoting *Wayte v. United States,* 470 U.S. 598, 608, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985)).

### a. Race Discrimination

■ Plaintiffs assert they "can prove CHAPLAIN CROWELL's violations against them were racially motivated." (First Amend. Compl. at 10, ¶ 88.C.). The only evidence regarding race discrimination, however, is (1) the statement by W. Seals–Bey that: "This Defendant [Crowell] often times cross schedules to [sic] these groups [black oriented religious groups] without telling either group that is involved to promote disharmony and ill-feelings between us" (Pls.' Response, Seals–Bey Decl. at 2, ¶ 8), (2) defendants' statement that the NOI was cross scheduled with the African Rastafarians on Sunday, March 15, 1998 (Defs.' Mem. at 10, ¶ 33, Crowell Decl. at 6 ¶ 13), and (3) defendants' statement that " '[a]nother religious group' [ (Moorish Science Temple) ] was moved from the Chapel to the Activities Room to provide the extra service for the NOI," on the Day of Atonement, Friday, October 16, 1998. (Defs.' Reply at 3, ¶ 33 compare Defs.' Mem. at 11, ¶ 37).[8] Plaintiffs' conclusory allegations are insufficient to withstand summary judgment on

plaintiffs claims of race discrimination by Chaplain Crowell, and such claims are dismissed.

### b. Religious Discrimination

■ Plaintiffs also claim religious discrimination. Plaintiffs allege that (1) the prison administration places the NOI leadership in SHU every time the NOI gets a high membership or participation level, (2) defendant Crowell refused to approve an early movement for the NOI to engage in congregational prayer during their December 1997 fast but allowed both NOI and Orthodox Muslims an early movement to engage in congregational prayer during the traditional Ramadan fast, (3) defendant Crowell refused to accept prayer oil donated to the NOI but Chaplain Lang allowed a Christian inmate to receive donated prayer oil, (4) defendant Crowell holds NOI video tapes for months, and always releases the second tape of a two-tape set before the first tape, (5) defendant Crowell makes it difficult for inmates to change religious preference to NOI in an effort to keep the number of NOI inmates low with the result the budget spent in support of NOI activities is low, (6) defendants refuse to allow plaintiffs to wear hobbycrafted fezzes but allow Orthodox Muslims, Moors, Rastafarians, and Jews to wear hobby-crafted Kufis, Crowns, and Yarmulkes, (7) Christian inmates are allowed to have inmates of other religions visit the Christian Sunday service but plaintiffs are not allowed to have inmates of other religions visit the Friday Jumah service unless the inmate has a SENTRY preference of NOI, (8) NOI members are restricted to one ceremonial meal a year while Christian holidays such as Christmas, Easter and Thanksgiving, are celebrated with fanfare,

---

**8.** Plaintiffs did not deny defendants' statement of fact ¶ 37 and are deemed by the court to have admitted the facts therein asserted.

and (9) defendant Mendez degrades plaintiffs' religion by speaking to plaintiffs in a demeaning and disparaging manner, using profanity, and accusing plaintiffs of being in a gang, and has expressed his animosity toward the NOI.

Plaintiffs' claims are stated in conclusory assertions of fact without support sufficient to raise a question of fact regarding purposeful religious discrimination. With regard to the first claim, plaintiffs cite to several incidents in which plaintiffs were placed in SHU but provide no information beyond bare assertions from which the court can determine the actions were based upon religious motivation. There is no record evidence from which the court could infer defendants' asserted reasons for placing plaintiffs in SHU were a pretext for discrimination. Plaintiffs provide no facts to establish any cycle in which NOI membership or participation increased until plaintiffs were placed in the SHU, decreased thereafter and began to increase again until plaintiffs were again placed in SHU. Plaintiffs have not met their burden to show facts which might establish a constitutional deprivation.

The second claim of discrimination is similarly unsupported. The charge is made as an aside in an attempt to refute any motive of good will which might be inferred from defendants' assertion that defendant Crowell purchased a prayer rug from the budget for use by the NOI. (Pls.' Response, Crocker Decl. at 4–5, ¶ 11). Plaintiffs allege defendant Crowell refused to approve early movement for congregational prayer but do not show any of the circumstances surrounding the alleged request or denial. Plaintiffs do not reveal who made the request, when the request was made, whether the request was made sufficiently early to allow the prison officials to respond, or whether the request was specifically denied or merely unanswered.

Each remaining claim is similarly unsupported. (3) Plaintiffs allege discrimination against the defendants in that **Chaplain Lang** treated a Christian inmate differently than the **defendants** treated plaintiffs but do not provide any admissible evidence that defendants were even aware of how Chaplain Lang treated the Christian inmate. (4) Plaintiffs provide no evidence of when or what specific tapes were withheld for how long or which instances involved circumstances in which the second tape was released before the first. The only specific incident addressed is that discussed in the court's free exercise discussion, in which the tapes were not released at all because of alleged inflammatory material contained therein. (5) Plaintiffs allege that defendant Crowell makes it difficult to change SENTRY religious preference, but do not point to a single inmate who desired to change preference and was denied the opportunity. Plaintiffs do not provide evidence from which the court may reasonably infer that defendant's stated reason for interviewing the inmates before changing preferences was a pretext for discrimination. (6) Plaintiffs present no evidence that hobbycrafted fezzes that did not contain the initials "FOI" were confiscated from plaintiffs. There is no record evidence beyond plaintiffs' bald assertions that inmates of other religious groups were allowed to keep hobbycrafted headgear or that defendants knew that inmates of other religious groups were allowed to keep such headgear. (7) Plaintiffs do not provide evidence that inmates desiring to attend Christian Sunday service are similarly situated to inmates desiring to attend Friday Jumah service. Plaintiffs do not provide evidence that any inmate **not** scheduled to work during the Friday Jumah service has been refused permission to attend because his SENTRY religious preference was not NOI. (8) The government may celebrate

Christian holidays in some way, but may not do so in a form that endorses Christian doctrine. *County of Allegheny v. Am. Civil Liberties Union Greater Pittsburgh Chapter*, 492 U.S. 573, 601, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989). Plaintiffs do not provide evidence that the holiday meals served in the prison on Christmas, Easter and Thanksgiving are served as a liturgical or ceremonial meal or that Christian groups are allowed multiple liturgical or ceremonial meals annually. Nor do plaintiffs provide evidence that the holiday meals are served in a manner that endorses Christian doctrine or that defendants serve the meals to discriminate against non-christians. Finally, (9) as stated above with regard to plaintiffs' free exercise claims, verbal abuse such as taunts and threats, even when directed at religious or ethnic background do not rise to the level of constitutional deprivations. Furthermore, plaintiffs do not provide evidence from which the court might reasonably infer that the reasons defendants assert for defendant Mendez's actions are merely pretext for discrimination. Such conclusory allegations as plaintiffs make do not rise to the level of a constitutional deprivation of plaintiffs' equal protection rights.

### c. Due Process Claims

#### 1. Defendant Ontiveros

■ Plaintiffs' due process claims against defendant Ontiveros must fail for the same reasons their equal protection claims fail. Plaintiffs assert that Ontiveros refused to provide Administrative Remedy forms to plaintiff Ford on several occasions and on other occasions failed to process such forms after plaintiff Ford returned them. That is the sum, and substance, of plaintiffs' evidence. Defendants provide evidence that defendant Ontiveros provided or processed such forms for plaintiff Ford on nine occasions in April,

May, July, August, October and November, 1997. Plaintiffs provide no specific evidence regarding a date, an issue, or any specific circumstances in which plaintiff Ford requested and was denied a form or in which plaintiff Ford submitted a form but never received an answer. Once again, such conclusory allegations do not rise to the level of a constitutional due process deprivation.

#### 2. Defendant Smith

■ The facts surrounding plaintiffs' due process claim against defendant Smith are largely uncontroverted. Plaintiff Ford was charged in an Incident Report by defendant Mendez with engaging in or encouraging a group demonstration and refusing to obey an order as a result of the April 27, 1998 "rap contest." On April 30, plaintiff Ford appeared before the Unit Discipline Committee, which referred the matter to the DHO. On April 30, plaintiff Ford was provided written notice of the DHO hearing. At his request, plaintiff Ford received staff representation at the hearing and requested three witnesses, who appeared and testified at the hearing. Plaintiff Ford was also advised of his rights and signed an Inmate Rights at Discipline Hearing form on April 30.

On May 21, plaintiff Ford appeared for his disciplinary hearing before defendant Smith. Plaintiff Ford made a statement in which he denied his guilt, and his three witnesses testified. Relying upon the incident report and investigation, Ford's statement, the statements of Ford's three witnesses and other documentary evidence, DHO Smith found Ford guilty as charged based upon the greater weight of the evidence, sanctioned Ford with a total of 45 days disciplinary segregation and 60 days loss of commissary privileges, and recommended a disciplinary transfer. Plaintiff Ford appealed the decision to the Regional

Director and to the Central Office, and both appeals were denied.

Plaintiffs do not argue that plaintiff Ford was not afforded the correct **procedures** in a prison disciplinary hearing. Rather, the evidence presented by plaintiffs is that "defendant Smith flatly refused to weigh the evidence (eye-witness statements, constitutional issues involved, and the lack of supporting information as contained in the so-called Supporting Memorandums [sic] that were submitted by staff members)." (Pls.' Response, Ford Decl. at 5, ¶ 11). Plaintiffs allege that DHO Smith reached the wrong conclusion in the hearing. In essence, plaintiffs seek judicial review of the decision reached in the hearing, and defendants admit that plaintiff Ford exhausted his administrative remedies in the BOP.

 As defendants assert, the decision of the BOP must be upheld if there is "some evidence" to show that the inmate committed the offense. *Superintendent, Mass. Corr. Inst. v. Hill,* 472 U.S. 445, 447, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985); *Shown v. Pebworth,* No. 95–7120, 1996 WL 5077, *2 (10th Cir. Jan.5, 1996) (citing *Hill,* 472 U.S. at 455–56, 105 S.Ct. 2768); Benny v. O'Brien, 736 F.Supp. 242, 244 (D.Kan. 1990) (citing *Hill,* 472 U.S. at 454–55, 105 S.Ct. 2768). "[A] court reviewing the findings of a prison disciplinary board need not examine the complete record, assess the credibility of the witnesses, nor weigh the evidence. Instead, 'the relevant question is whether there is any evidence in the record that could support the conclusion reached by the disciplinary board.'" *Benny,* 736 F.Supp. at 244 (quoting *Hill,* 472 U.S. at 455–56, 105 S.Ct. 2768)

At the hearing, the DHO considered, among other evidence, the following: An Incident Report, dated Apr. 27, 1998, signed by defendant Mendez stating that "inmate Ford stated, 'now you see fellow brother, what the white racist man is trying to do, my fellow brothers if we unite as one we can overcome this type of continues [sic] racism.' Inmate Ford refused staff orders to discontinue his activities." (Defs.' Mem., Smith Decl., Attachs. 2, 3). A memorandum by Lieutenant R. Johnston, dated Apr. 27, 1998 stating, "Inmate Ford stated, at the beginning of his meeting with the inmates, 'Someone, I do not know what rank he is. That someone, tried to prevent us from having this meeting tonight.'" (Defs. Mem., Smith Decl., Attach 3). A memorandum by Officer Charles Hutchison, dated Apr. 27, 1998, stating that after Chaplain Crowell ordered the inmates to leave the room, "[t]he inmates became hesitant and refused the order." (Defs. Mem., Smith Decl., Attach 3). April 27, 1998 memorandum by Chaplain Crowell, stating that before the service was terminated, plaintiff Ford "said that the inmates that were in the room did not need to ask everytime [sic] they wanted to do anything. Ford also stated that they had spoken to SIS and the Recreation Department about the rap meeting and that they had no problem with the meeting." (Defs. Mem., Smith Decl., Attach 3).

The court finds that the evidence cited above constitutes "some evidence" that plaintiff Ford committed the offenses of which he was charged and found guilty. Consequently, the court must affirm the decision of the BOP to sanction plaintiff Ford. The court finds that defendant Smith did not violated plaintiffs' due process rights pursuant to the Fifth Amendment of the United States Constitution.

Based upon the analyses above, the court finds that all defendants are entitled to summary judgment on all constitutional claims presented. All constitutional claims against all defendants are dismissed.

## V. Remaining Matters

 Reading the amended complaint broadly, plaintiffs may be found to assert the common law tort of defamation. (First Amend. Compl. at 9, ¶ 85 ("defaming the characters of the plaintiffs ... slander of the plaintiffs' religious faith")). Under Kansas law, however, recovery for defamation is not permitted based upon establishment of slander per se; damage to reputation is an essential ingredient of an action for defamation. *Zoeller v. Am. Family Mut. Ins. Co.*, 17 Kan.App.2d 223, 834 P.2d 391, rev. denied 251 Kan. 942 (1992). Plaintiffs have neither alleged, nor provided evidence admissible at trial, of any damage to their reputations. Therefore, summary judgment is granted and plaintiffs' claims for defamation are dismissed.

Plaintiffs have amended their complaint to include claims against defendants pursuant to the Religious Freedom Restoration Act (RFRA), 42 U.S.C. § 2000bb et seq. But, defendants have not answered the second amended complaint and neither party has adequately addressed dismissal or summary judgment in light of the Act. Defendants, in their response to plaintiffs motion to amend argue the constitutionality of the Act is in doubt. (Defs.' Response to Mot. to Amend (Doc. 51) at 3, n. 3). However, after defendants filed that memorandum, the Tenth Circuit held that RFRA as applied to the federal government is constitutional, and subsequently applied the statute to an inmate's free exercise claims. *Kikumura v. Hurley*, 242 F.3d 950, 960 (10th Cir.2001). The court is unable, therefore, to rule on plaintiffs' RFRA claims. Defendants shall answer or otherwise respond to the RFRA claims made in plaintiffs second amended complaint within sixty days after service of a copy of this order.

The court will reserve ruling on defendants' arguments regarding lack of personal jurisdiction over defendants Durkin, Mendez, and Smith until a future date. However, the court notes that defendants assert lack of service of process pursuant to Fed.R.Civ.P. 4(i)(2) as to certain defendants. Because plaintiffs are pro se litigants for whom the United States Marshal's Service was directed to serve process, the court will not penalize such plaintiffs for the United States Marshals failure to serve process as ordered. *Stoenescu v. Jablonsky*, 162 F.R.D. 268, 270 (S.D.N.Y.1995). Defendants, as officials of the BOP shall provide this court with the most current information available to the BOP from any source which might aid in service of process for all defendants as to whom defendants have alleged or shall in the future allege lack of service of process in any capacity or shall show cause why such information should not be provided to the court within sixty days of the filing of this order. For cause shown, defendants may provide such information to the court in camera.

 As a final matter, the court notes that plaintiffs assert a conflict of interest precluding the United States Attorney's Office for the District of Kansas from representing the defendants in this case while at the same time investigating their alleged illegal acts. (Pls.' Response at 1). Plaintiffs' claim is without merit. A government attorney's office may prosecute violations by a government officer regardless of that office's representation of the officer in pending litigation. *United States v. Troutman*, 814 F.2d 1428, 1438 (10th Cir.1987) (state Attorney General). Moreover, where it is shown that an Assistant United States Attorney is subject to a conflict of interest, the proper remedy is to remove that individual, not all of the attorneys in the district, from the case. *United*

*States v. Vlahos,* 33 F.3d 758, 763 n. 5 (7th Cir.1994). Finally, the court finds that plaintiffs have presented no allegations from which the court might find a conflict of interest. The fact that plaintiffs have made a complaint involving defendants to the United States Attorney's office does not establish a conflict of interest of the Assistant United States Attorney assigned to this case, nor even of the United States Attorney for the District of Kansas. The court finds no conflict of interest on the facts alleged.

## VI. Orders

**IT IS THEREFORE ORDERED** that plaintiffs' motion for extension of time (Doc. 39) is granted.

**IT IS FURTHER ORDERED** that plaintiffs' "Motion for an Enlargement of Time and for an Order to Correct Clerical Mistakes and Omissions" (Doc. 45), to the extent it may be a motion for an extension of time to file a response to defendants' motion to dismiss or to file plaintiff's motion to amend, is granted as unopposed. To the extent plaintiffs' motion seeks to amend the complaint, it is subsumed in plaintiffs' motion to amend and is, therefore, moot. In all other respects, the motion is denied.

**IT IS FURTHER ORDERED** that plaintiffs' motion to correct clerical mistakes (Doc. 47) is deemed a motion to amend, is granted in part, and is deemed amended as stated supra at 13–14.

**IT IS FURTHER ORDERED** that this lawsuit shall not be maintained as a class action and, therefore, plaintiffs' motion to change lead plaintiff (Doc. 43) is denied.

**IT IS FURTHER ORDERED** that plaintiffs' motion and supplemental motion to appoint counsel (Docs. 25 & 40) are denied.

**IT IS FURTHER ORDERED** that defendants' motion for summary judgment (Doc. 35) is granted in part as follows. All constitutional claims asserted against all defendants are dismissed. Plaintiffs' defamation claims are dismissed.

**IT IS FURTHER ORDERED** that defendants, as officials of the BOP shall, within sixty days of the filing of this order, provide this court with the most current information available to the BOP from any source which might aid in service of process for all defendants as to whom defendants have alleged or shall in the future allege lack of service of process in any capacity or shall show cause why such information should not be provided to the court. For cause shown, defendants may provide such information to the court in camera.

The court finds that Religious Freedom Restoration Act claims are the only claims remaining in this case, **IT IS THEREFORE ORDERED** that defendants shall answer or otherwise respond to the Religious Freedom Restoration Act claims in the Second Amended Complaint within sixty days after service of this order.