**PUBLISH**

UNITED STATES COURT OF APPEALS

**Filed 8/26/96**

FOR THE TENTH CIRCUIT

---

DONALD ADAM PENROD,

       Plaintiff-Appellant,

v.

ARISTEDES ZAVARAS; FRANK O.
GUNTER; MARK McKINNA;
ROBERT FURLONG; DELAYNE
TORNOWSKI; RICHARD MURRAY;
MRS. TORNOWSKI; MR. SHIREY;
MR. DRAPER; MR. JARVIS; MR.
SOKOL; RENNAE MURPHY;
BETTY FULTON; RICHARD
MISCHIERA; and JOHN DOE SHIFT
COMMANDER; CAPTAIN ON
DUTY 3:30 P.M., 8/28/93; defendants
in their individual capacities,

       Defendants-Appellees.

No. 95-1364

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. No. 94-B-1207)

---

Submitted on the briefs:

Donald Adam Penrod, pro se, Crowley, Colorado.

Gale A. Norton, Attorney General, and Cristina Valencia, Assistant Attorney General, Civil Litigation Section, Tort Litigation, District of Colorado, Denver, Colorado, for Defendants-Appellees.

_____

Before PORFILIO, BRIGHT,[*] and KELLY, Circuit Judges.

_____

PER CURIAM.

_____

After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. See Fed. R. App. P. 34(a); 10th Cir. R. 34.1.9. The case is therefore ordered submitted without oral argument.

Plaintiff Donald Penrod currently is serving a sentence at the Centennial Correctional Facility in Canon City, Colorado. Acting pro se, he filed this 42 U.S.C. § 1983 action alleging numerous constitutional violations when he was incarcerated at the Limon Correctional Facility [Limon] in Limon, Colorado. He seeks monetary damages and injunctive relief. The district court granted defendants' motion for summary judgment. We affirm in part and reverse in part.

_____

[*] Honorable Myron H. Bright, Senior Circuit Judge, United States Court of Appeals for the Eighth Circuit, sitting by designation.

## I. Background

Plaintiff was incarcerated in the Limon facility in 1992. On January 28, 1992, two Limon corrections officers sustained knife wounds while breaking up an altercation between 150 inmates. Limon had been plagued with security problems since opening in 1991; three inmates were murdered and one committed suicide during its first two years of operation.

In response to the security problems, prison officials sought better methods for controlling the prison population. In early February 1992, a decision was made to keep all unassigned inmates (inmates who did not have jobs or participate in other programs) in an administrative segregation unit called Living Unit II. Prison officials could monitor the activities and control the movement of unassigned prisoners once they were all housed together. Restrictions were placed on the activities of prisoners in Living Unit II. Unassigned inmates in Living Unit II were given the opportunity to enter programs or find jobs, and once they entered a program or found a job they were moved into another unit. Plaintiff was placed in Living Unit II because he was unemployed and did not participate in other programs. Plaintiff was removed from Living Unit II in December 1992.

The Limon facility was able to transfer violent and disruptive prisoners when new prisons were opened in Colorado. These transfers have calmed the situation at the Limon facility, and since then, the Living Unit II concept has been abandoned.

Plaintiff claims that this placement in Living Unit II violated his right to equal protection in that defendants created an illegal suspect class of inmates who were subjected to cruel and unusual punishment and loss of privileges. He also asserts that his Fourteenth Amendment right to due process, his First Amendment right to petition the courts, and his Sixth Amendment right to access to the courts were violated. Plaintiff filed a second amended complaint in which he alleged additional Eighth Amendment violations and claimed that he was subjected to employment discrimination by his placement in Living Unit II.

The district court granted defendants' motion for summary judgment. We must liberally construe plaintiff's complaint because he is representing himself. Haines v. Kerner, 404 U.S. 519, 520-21 (1972). Summary judgment may be granted when the moving party demonstrates there is no evidence to support the claims of the nonmoving party or that there is no genuine issue as to any material fact. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). An issue is "genuine" only if the evidence is such that a reasonable fact finder could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Id.

## II.  Access to the Courts and Legal Resources

Plaintiff claims that he was denied access to the prison law library and the courts as a result of his placement in Living Unit II.  In Lewis v. Casey, 116 S. Ct. 2174 (1996), the Supreme Court recently clarified a prisoner's right to access legal resources and the courts.  The Court explained that under Bounds v. Smith, 430 U.S. 817 (1977), the Fourteenth Amendment only guarantees the right of access to the courts.  Although providing access to a law library is an acceptable means of effectuating the right of access to the courts, Bounds did not create an independent right of access to a law library or legal assistance.  Lewis, 116 S. Ct at 2179-80.  The Lewis Court stated:

> Because Bounds did not create an abstract, free-standing right to a law library or legal assistance, an inmate cannot establish relevant actual injury simply by establishing that his prison's law library or legal assistance program is sub-par in some theoretical sense.  That would be the precise analogue of the healthy inmate claiming constitutional violation because of the inadequacy of the prison infirmary.  Insofar as the right vindicated by Bounds is concerned, "meaningful access to the courts is the touchstone," Bounds, 430 U.S., at 823 . . . (internal quotation marks omitted), and the inmate therefore must go one step further and demonstrate that the alleged shortcomings in the library or legal assistance program hindered his efforts to pursue a legal claim.

Id. at 2180.  Therefore, an inmate must satisfy the standing requirement of "actual injury" by showing that the denial of legal resources hindered the prisoner's efforts to pursue a nonfrivolous claim.  Id. at 2179, 2182.  Plaintiff alleged in his complaint:

> The defendants severely restricted Plaintiff's regularly [sic] library privileges to only fifteen (15) minutes on Thursdays.  Because the

> defendants placed restrictions on the number of segregated inmates who could go to the library on Thursdays, Plaintiff spent approximately eighteen (18) hours per day in a cell for weeks at a time with nothing to read which caused Plaintiff mental deterioration, anxiety and deep depression.
>
>  . . . .
>
> Before July 27, 1992 Plaintiff's Law library privileges were afternoons and evenings, Monday through Friday, for at least five (5) hours per day. From July 27, 1992 until approximately December 10, 1992 the defendants restricted Plaintiff's Law Library access unreasonably to only one (1) to five (5) hours per week. Sometimes Plaintiff's legal access requests slips were thrown away or ignored.

Plaintiff's Amended Complaint at 28 (emphasis omitted). Plaintiff makes a general allegation in his brief on appeal that his restricted library privileges denied him access to the courts. The injury plaintiff complains of, however, is that the restricted access left him "with nothing to read which caused Plaintiff mental deterioration, anxiety and deep depression." Plaintiff failed to allege that the library restrictions placed on unassigned prisoners hindered his effort to pursue a nonfrivolous legal claim.

Additionally, the constitutional obligation to provide inmates access to courts does not require states to give inmates unlimited access to a law library, see Twyman v. Crisp, 584 F.2d 352, 358 (10th Cir. 1978), and inmates do not have the right to select the method by which access will be provided. Ramos v. Lamm, 639 F.2d 559, 583 (10th Cir. 1980), cert. denied, 450 U.S. 1041 (1981). Time records of when Mr. Penrod spent time in the law library at Limon during the periods in question were

attached to defendants' motion for summary judgment; the records show that he had access to the library several hours every week. (R., Vol. I, No. 39.) When a prison limits access to the courts by restricting an inmate's access to legal resources, "we must determine whether the prison's policy is reasonably related to legitimate penological interests." Petrick v. Maynard, 11 F.3d 991, 994-95 (10th Cir. 1993). In the past we have considered economic factors, the reasonable alternatives to accommodating inmate requests, and "whether there is a 'valid' connection between the prison policy and putative government interest." Id. at 995; see Twyman, 584 F.2d at 359 (considering economic factors in examining the constitutionality of prison regulations). Considering the security problems at the Limon facility, the limits on unassigned prisoners' access to the law library were not unreasonable or constitutionally impermissible.

## III. Alleged Retaliatory Acts

Plaintiff claims that the defendants took retaliatory actions against him for bringing suits against the prison and restricted him from petitioning the government for redress of his grievances in violation of the First Amendment. Plaintiff specifically alleged that the defendants forced him to choose between hygiene items and pursuing grievances and legal actions, seized his legal materials and transferred him into administrative segregation in retaliation for bringing suit

against prison officials, and threatened him with further retaliation if he did not stop complaining. Defendants have not specifically disputed these allegations. The district court granted defendants summary judgment because it found they had qualified immunity because plaintiff failed to allege with sufficient specificity the parameters of the constitutional violation asserted. See Jantz v. Muci, 976 F.2d 623, 627 (10th Cir. 1992), cert. denied, 508 U.S. 952 (1993). Defendants do not have qualified immunity in this case, however, because it is well established that prison officials must provide inmates access to the courts, Bounds, 430 U.S. at 828, and prison officials may not harass or retaliate against an inmate for exercising his right of access to the courts. Smith v. Maschner, 899 F.2d 940, 947-48 (10th Cir. 1990); see also U.S. Const. amend. I (protecting the right of the people "to petition the Government for a redress of grievances"); Hudson v. Palmer, 468 U.S. 517, 523 (1984) (stating that "prisoners have the constitutional right to petition the Government for redress of their grievances, which includes a reasonable right of access to the courts"). Plaintiff alleged in his complaint:

> Between July 17, 1992 and July 26, 1992 Plaintiff had a pre-trial conference by telephone with the Honorable United States District Court in the office of his Case Manager, Mrs. Rennae Murphy. Between April 1992 and July 21, 1992 the defendants had kept the facility on total lockdown most of that time, declaring state of emergencies that at least twice didn't even exist. Between July 13, 1992 and July 27, 1992 the defendants, particularly Mr. Mark McKinna, totally denied Plaintiff access to the Law Library. Be- [sic] of this Plaintiff was unprepared for the pre-trial conference.

. . . .

When the pre-trial conference ended, Plaintiff told Mrs. Rennae Murphy that he'd been without toothpaste since the total lockdown began July 13, 1992. plaintiff [sic] told her he had no money to purchase toothpaste and that during total facility lockdowns, inmates were suppose [sic] to receive toothpaste and razors. Additionally, Plaintiff was entitled under A.R. 850-14, as an indigent inmate, to receive toothpaste and razors. Mrs. Rennae Murphy denied Plaintiff's request stating, "You shouldn't be suing people," in reference to Civil Action Number 91-N-965, which involved the pre-trial conference, depriving Plaintiff of hygiene items given other similarly situated inmates by the Case Manager.

. . . .

Mrs. Rennae Murphy's denial was to punish Plaintiff for having the pending lawsuit and her denial impinged and violated Plaintiff's First Amendment right to Petition the Government for Redress of Grievances. Const. Amend. I.

. . . .

After Mrs. Rennae Murphy denied Plaintiff toothpaste and razors, Plaintiff requested grievance forms because he simply had no money and it appeared he would be segregated for a while without money or toothpaste and razors. Mrs. Rennae Murphy refused to give Plaintiff grievance forms, that are freely given to other similarly situated inmates who wish to exercise the grievance procedure. . . .

. . . .

Ms. Betty Fulton refused Plaintiff hygiene items, telling Plaintiff that if he wasn't suing police officers . . . and spending so much money on legal postage, that Plaintiff would be able to afford toothpaste and razors. . . . Ms. Betty Fulton stated Plaintiff should not be suing people, . . . .

Plaintiff's Amended Complaint at 29-30. Plaintiff further alleged:

[T]he Administration and security officers were coming to Plaintiff's cell under the guise of cell searches with the intent and purpose to harass and intimidate, actually making threats to Plaintiff to stop complaining and not to file civil action against Case Manager Betty Fulton, Mailroom Officers, Mrs. Blasingame and Ms. Cook, Robert Furlong and Delayne Toronowski [sic], reading, photocopying and confiscating legal work and throwing it all over the cell. That Security Officer Solomon had admitted he was harassing and retaliating against me, that he was under orders to do so, . . . .

. . . .

On approximately July 21, 1993 these defendants [Mr. Draper, Mr. Richard Mischiera, Mr. C. Jarvis and Mr. Sokol] began taking physical actions carrying out their conspiracy to retaliate against Plaintiff for exercising his First Amendment rights, by taking Plaintiff off permanent party status in Living Unit One and transferring Plaintiff specifically to Unit Six, specifically to the case load of "Case Manager Linda Toronowski [sic]," wife of Delayne Toronowski, defendant in Case Number 93-Z-1727. The defendants did this to carry out their conspiracy to retaliate against Plaintiff specifically through Case Manager Linda Toronowski [sic].

. . . .

Additionally, Sargent Rocha and T. Smelser confiscated Plaintiff's [legal] notes . . . . When Plaintiff asked Sargent Rocha and T. Smelser why they were searching Plaintiff, T. Smelser told Plaintiff they were doing so on orders of Captain Bauer and that Plaintiff had better start minding his own business. . . .

Then on April 23, 1993, . . . Sargent Draper and Sargent Maher came to Plaintiff's cell and read Plaintiff's legal work and confiscated all the legal materials and federal law books . . . .

Plaintiff's Amended Complaint at 38, 42-43, 48. The qualified immunity afforded in <u>Jantz</u> does not apply in this case because the jurisprudence prohibiting retaliatory acts against prisoners for reporting grievances is well-established. Plaintiff's

-10-

allegations regarding the retaliatory acts--which are uncontroverted by the defendants--are very specific and raise a genuine issue of material fact. Thus, we must reverse and remand on this issue because the district court was incorrect in holding that defendants were entitled to qualified immunity on the First Amendment retaliation claim.

## IV. Cruel and Unusual Punishment

Plaintiff claims that the conditions of his confinement in Living Unit II violated his Eighth Amendment right to be free from cruel and unusual punishment. Conditions of confinement fall within the Eighth Amendment because they are part of the penalty that criminal offenders pay for their offenses. See Whitley v. Albers, 475 U.S. 312, 318-19 (1986). Although prison officials have broad administrative and discretionary authority to manage and control prisons, Bailey v. Shillinger, 828 F.2d 651, 653 (10th Cir. 1987), they must provide humane conditions of confinement guided by "contemporary standards of decency." Estelle v. Gamble, 429 U.S. 97, 103 (1976). "[A] prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." Farmer v. Brennan, 511 U.S. 825, 114 S. Ct. 1970, 1984 (1994). Therefore, we recently explained that an Eighth Amendment violation exists

"only when the alleged deprivation is 'objectively, "sufficiently serious,"'" and the prison official acts with '"deliberate indifference" to inmate health or safety.'" Adkins v. Rodriguez, 59 F.3d 1034, 1037 (10th Cir. 1995) (citations omitted). Plaintiff specifically alleged that prison officials retaliated against him by denying him free toothpaste and razors from July 13, 1992 to September 20, 1992. He asserts this violated his right to be free from cruel and unusual punishment because it caused his gums to bleed and recede and tooth decay that eventually had to be treated by a dentist. Plaintiff has raised a genuine issue of material fact in regard to whether prison officials' alleged denial of hygienic items caused plaintiff serious harm. Thus, we reverse and remand on whether prison officials caused plaintiff serious harm by failing to satisfy his basic hygienic needs.

## V. Equal Protection

Plaintiff alleged that he was denied equal protection because the defendants created an illegal suspect class of inmates who were subjected to cruel and unusual punishment and loss of privileges. The Equal Protection Clause requires that no state deny any person within its jurisdiction the equal protection of the laws. U.S. Const. amend. XIV. An equal protection violation occurs when the government treats someone differently than another who is similarly situated. City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985). Plaintiff made no allegation

indicating that he is a member of a constitutionally protected class or that he has been denied a fundamental right, so the defendants' action in placing plaintiff in Living Unit II must only bear a rational relation to a legitimate state purpose. Jacobs, Visconsi & Jacobs, Co. v. City of Lawrence, 927 F.2d 1111, 1119 (10th Cir. 1991). No equal protection violation occurred in this case because the defendants' action in placing plaintiff in Living Unit II was rationally related to the legitimate purpose of ensuring the security of the facility. The Living Unit II was created to control unassigned inmates, not to punish them. Plaintiff's equal protection claim is meritless.

## VI. Due Process

Plaintiff claims that he was segregated from the general inmate population without a hearing in violation of his due process rights. "The Due Process Clause standing alone confers no liberty interest in freedom from state action taken within the sentence imposed." Sandin v. Conner, 115 S. Ct. 2293, 2298 (1995) (quotation omitted). The due process rights of prisoners are subject to reasonable limitation or restriction in light of the legitimate security concerns of the institution, Bell v. Wolfish, 441 U.S. 520, 546-47 (1979), and "the transfer of an inmate to less amenable and more restrictive quarters for nonpunitive reasons is well within the terms of confinement ordinarily contemplated by a prison sentence." Hewitt v.

Helms, 459 U.S. 460, 468 (1983). Although states may in some circumstances create liberty interests protected by the Due Process Clause, the liberty interest created by prison regulations "will generally be limited to freedom from restraint which . . . imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Sandin, 115 S. Ct. at 2300.

Here, plaintiff cites to prison regulations which set forth procedures for segregating a prisoner beyond ten days. Plaintiff, an unassigned inmate, was placed with other unassigned inmates in administrative segregation for security purposes. Unassigned prisoners were informed that they would be moved to another unit once they entered a program or found a job, and plaintiff's status as an unassigned prisoner was due to his own conduct. Progress assessment summaries by plaintiff's case managers, provided by defendants as an exhibit to their motion for summary judgment, show plaintiff's unwillingness to work or participate in prison programs. In regard to work one summary states, "Mr. Penrod has not been employed this review period, he has not been assigned since December 91. Mr. Penrod chooses not to work." (R., Vol. I, No. 39, ex. B.) As for vocational and academic programs it states, "Mr. Penrod has had no participation this review period and shows no interest in obtaining a position in either of these areas." (Id.) Even though the conditions in Living Unit II were more restrictive than those imposed upon the general population, it offered inmates all of the same privileges as the general population

-14-

inmates. Furthermore, "administrative segregation is the sort of confinement that inmates should reasonably anticipate receiving at some point in their incarceration." Hewitt, 459 U.S. at 468. Prison officials were within their authority to limit the movement of unassigned prisoners, particularly in light of the security problems at the Limon facility. See Sandin, 115 S. Ct. at 2299 (federal courts must "afford appropriate deference and flexibility to state officials trying to manage a volatile environment"). The administrative segregation regime plaintiff was subjected to as a result of legitimate security concerns did not impose an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison. Thus, plaintiff's due process claim lacked merit because the prison regulations did not create a liberty interest.

## VII. Employment Discrimination

Plaintiff claims that he was subjected to employment discrimination by being placed in Living Unit II. He claims that employment opportunities were made available to the general prison population, but not to Living Unit II inmates. The defendants dispute this claim. Nevertheless, it is meritless because a state has no constitutional obligation to provide an inmate with employment, even if a statute or regulation creates such an interest. We have previously held that prisoners do not have a constitutional right to employment absent a regulation entitling prisoners to

employment.  <u>Templeman v. Gunter</u>, 16 F.3d 367, 370 (10th Cir. 1994).  Our holding in <u>Templeman</u> was modified by <u>Sandin</u>, however, in that prison regulations entitling prisoners to work do not create a constitutional liberty interest because a denial of employment opportunities to an inmate does not impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."  <u>Sandin</u>, 115 S. Ct. at 2300.

The judgment of the United States District Court for the District of Colorado is AFFIRMED in part, REVERSED in part and REMANDED.