**Miki Ann DIMARCO, Plaintiff,**

v.

**WYOMING DEPARTMENT OF CORRECTIONS, DIVISION OF PRISONS, WYOMING WOMEN'S CENTER; Judy Uphoff, individually; Nola Blackburn, individually; Viki McKinney, individually; Karen Rea, individually; Donna Lloyd, individually; Employees & Does I–X; Black & White Corporations, A–J; and Red & Yellow State Agencies, 1–10, Defendants.**

No. 03–CV–1006–B.

United States District Court, D. Wyoming.

Feb. 18, 2004.

W Thomas Sedar, Casper, WY, for Plaintiffs.

Craig E Kirkwood, Wyoming Attorney General, Cheyenne, WY, for Defendants.

## MEMORANDUM OF ORDER AND JUDGMENT

BRIMMER, District Judge.

Plaintiff Miki Ann DiMarco brings this suit against the Wyoming Department of Corrections, Division of Prisons, Wyoming Women's Center; Judy Uphoff, Nola Blackburn, Viki McKinney, Darlene Rea, and Donna Lloyd asserting five causes of action: (1) a § 1983 under the Eighth Amendment; (2) a § 1983 Procedural Due Process claim under the Fourteenth

Amendment; (3) a § 1983 Substantive Due Process claim under the Ninth and Fourteenth Amendment and Wyoming Constitution § 97–1–036; and (4) a § 1983 Equal Protection claim under the Fourteenth Amendment.

This Court conducted a bench trial starting on January 20, 2004 and ending on January 29, 2004. At the close of proceedings, the parties submitted Proposed Findings of Fact and Conclusions of Law and the Court took the matter under advisement. This Court now issues its Findings of Fact and Conclusions of Law and enters Judgment. Fed.R.Civ.P. 52(a), 58. After hearing the issues presented during the bench trial, considering the evidence, and being fully advised of the premises, the Court **FINDS** and **ORDERS** as follows:

### Statement of Parties and Jurisdiction

Plaintiff, Miki Ann DiMarco, is a resident of Douglas, Wyoming. Plaintiff was incarcerated at the Wyoming Women's Center ("WWC") from May 3, 2000, through July 10, 2001, upon the revocation of her probation on an earlier check fraud conviction in the First Judicial District, Laramie County, Wyoming. Plaintiff was born intersexual (or as a hermaphrodite).[1] A person is intersexual if they have both male and female characteristics, including in varying degrees reproductive organs, secondary sexual characteristics, and sexual behavior. This condition is the result of an abnormality of the sex chromosomes or a hormonal imbalance during the development of the embryo.

Defendant State of Wyoming Department of Corrections Division of Prisons ("WDOC") has general control over all pe-nal institutions in Wyoming. Defendant WWC is a penal institution in Wyoming that has control and custody over women inmates. The WWC is located in Lusk, Wyoming. The individual Defendants are being sued as individuals and not in their official capacity. Defendant Judith Uphoff, is the former Director and Chief Administrative Officer of the Wyoming Department of Corrections and was in this capacity during the entire period in contention. Defendant, Nola Blackburn, is the Warden of the WWC. Defendant, Viki McKinney, is a Major at the WWC. Defendant, Darlene Rea, is a Lieutenant at the WWC. Defendant, Donna Lloyd, is a Corporal at the WWC.

The Court has federal question and supplemental jurisdiction. 28 U.S.C. §§ 1331, 1343, 1367. Venue is proper. 28 U.S.C. § 1391(b).

### Findings of Fact

1. At all relevant times herein, Defendant Judith Uphoff was the Director of the Wyoming Department of Corrections.

2. At all relevant times herein, Defendant Nola Blackburn was the Warden of the WWC.

3. At all relevant times herein, Defendants Major Victoria McKinney, Lieutenant Darlene Rea and Corporal Donna Lloyd were employed as correctional officers at WWC and all resided in Lusk, Wyoming.

4. Plaintiff Miki Ann DiMarco is classified as an individual of ambiguous gender. Plaintiff is closer to being a hermaphrodite than either a male or female. Plaintiff has a nearly complete set of male reproductive

---

**1.** At the hearing, Defendants represented that the prison medical staff determined that Plaintiff was anatomically and biologically a "male." However, Plaintiff has chosen to live her life, and has functioned throughout her life, as a female. Plaintiff refers to herself with feminine pronouns throughout her pleadings. In accord with the Tenth Circuit's practice, this Court refers to litigants as the record suggests they prefer to be addressed. *Brown v. Zavaras,* 63 F.3d 967, 968 n. 1 (10th Cir.1995).

organs however does not have testicles. Plaintiff has no female reproductive organs.

5. Plaintiff has lived as a female since puberty and identifies herself as being of female gender.

6. Plaintiff's gender ambiguity was congenital in nature and the result of a disruption in her gonadal development resulting in non-typical hormone production. (Testimony of Dr. Maxwell Taylor).

7. Plaintiff was incarcerated at WWC on May 2, 2000 upon revocation of her probation from an earlier conviction for check fraud by the Honorable Edward Grant, District Judge, First Judicial District, State of Wyoming. The probation revocation was due to lack of verifiable identification and positive drug tests.

8. After the probation revocation, Plaintiff was initially committed to the Laramie County Jail for approximately thirty-eight (38) days and was housed with the female population without any reported incident and got along just fine with the other female inmates.

9. Plaintiff was transported to WWC on May 2, 2000 by two correctional officers, Defendant Lloyd and Henry, after being picked up at the Laramie County Detention Center.

10. An initial physical inventory was performed at the Laramie County Jail by the correctional officers which included a strip search, pursuant to policy, and made notations regarding unusual marks, scars and tattoos.

11. Upon arrival at WWC, a second physical search was performed pursuant to processing policy. The search was performed by a nurse with a correctional officer in attendance. During the physical search it was noted that Plaintiff bore a penis.

12. Plaintiff was immediately housed in Pod 3 of the maximum security East wing of WWC. Pod 3 is segregated from the general population. It is customary in the corrections profession to segregate new inmates from the general prison population until the prison officers are able to evaluate them by placing them into the East Wing of the WWC.

13. Plaintiff remained housed in Pod 3 and separated from the general population throughout her incarceration, a total of 438 days, from May 2, 2000 to July 10, 2001.

14. The East wing of the WWC is the maximum security wing and has three housing pods; Pods 1,2 and 3.

15. Pod 3 is the most restrictive and isolated housing pod at the WWC, and it is the segregated housing unit most often used to segregate serious offenders for punishment. The Pod is very stark with each cell consisting of a bed, a steel sink and steel toilet. There are only four individual cells in Pod 3. The cells are painted cement blocks, with grey solid steel doors. The four cells are accessed through a small "day room," which consists of a small steel table permanently bolted to the floor with a steel bench, also bolted down, and a T.V. high on the wall, controlled by the guards in the glass-encased area from which they control all doors in all three pods. This contrasts with the West wing, where the halls have red brick facing, floors are carpeted, cells doors are wooden. The West wing cells have cupboards for personal effects. There are places for hanging clothes, and there may be some curtains on the windows. The day rooms in the West wing are very comfortable, with overstuffed furniture, tables, T.V., pictures and other decorations.

16. Plaintiff had daily contact with the nursing staff.

17. Plaintiff was not double-bunked, her bed clothes were changed on a weekly

basis and Plaintiff's clothing was washed daily.

18. Plaintiff had adequate clothing while incarcerated. Pursuant to the property grid for "Closed/Restrictive" classification, Plaintiff was given two sets of clothing while the general population was granted five sets.

19. Plaintiff had items relating to personal hygiene delivered at no cost to her, including soap, shampoo, toothpaste, and a toothbrush. Plaintiff had no funds on the prison books and was unable to work for pay since she was housed in Pod 3 of the East wing. WWC Prison policy does not allow inmates to work while housed in Pod 3.

20. Plaintiff received three meals a day and ate the same food as was fed to the general population. Plaintiff had to eat meals in her cell and not with any other inmates or in the Pod 3 day room.

21. Plaintiff had access to reading materials from the library cart and could request books be delivered to her.

22. Plaintiff had access to the prison Chaplain.

23. Plaintiff had access to the prison gymnasium, but the time was limited to only when no other inmate was using the facility and when a guard could transport her down to the gym.

24. Plaintiff had access to and used the prison physician twenty-six (26) times. Plaintiff also used the service of Dr. Coyle, D.O. and number of specialists located off-site.

25. In Pod 3, Plaintiff was denied the following privileges: any human contact with fellow inmates, working for pay, access to the general population day room, access to the cafeteria or commissary, access to inmate educational advantages, and a hair cut. Plaintiff was required to eat all meals in her cell which did not have a table or chair so she was constrained to sit on her bed or toilet to eat. Plaintiff was allowed out of her cell and into the Pod 3 day room a maximum of five and one-half hours a day. Plaintiff was not allowed to have everyday possessions which were allowed in minimum and even in certain East wing pods (Pods 1 and 2) such as jewelry, make up, hair pick, tweezers, nail clippers, mirror, facial tissue, colored pencils, hobby craft, religious items, cassette tapes or player, calculator, clock, clock radio, lamp, television, walkman cassette, hair dryer, and thermal top or bottoms. (Ex. 42).

26. Plaintiff was provided a deck of playing cards by a former corrections officer but the cards were confiscated after three days. WWC rules and policy permits inmates assigned as "Closed/Restricted" to obtain and use playing cards. On the WDOC Offender Property Matrix, Item 8 is two decks of playing cards. The matrix shows that two decks of playing cards are allowed in all cells except "Maximum" and "Reception/Assessment." Playing cards are even provided to death row inmates. (See Ex. 42).

27. The Plaintiff's placement in Pod 3 of the maximum security wing of WWC was an assignment to a segregated housing unit, which was at the least administrative segregation and at the worst punitive segregation which was based solely on Plaintiff's gender and physical characteristics.

28. Plaintiff received a total score of 1 on the initial intake evaluation form, which is the lowest possible risk score and which initially classified Plaintiff as a minimum security risk, eligible for minimum security general population housing in the West wing of the WWC with the maximum available privileges and possessions.

29. Plaintiff's initial minimum classification was overridden by Deputy Warden Sides because Plaintiff appeared to be a

male in a female institution. Deputy Warden Sides handled this override classification since Warden Blackburn was on vacation. This override was approved by Warden Blackburn upon her return from vacation.

30. On June 1, 2000, Plaintiff was evaluated for custody classification purposes by Laurie Lee Crawford, WWC caseworker assigned to Plaintiff. Crawford continued the initial intake override by stating "Classification override to Close Restriction based on unique set of medical issues. This requires separate housing in pod 3." (Ex. 21). WWC Policy prohibits inmates from being provided notice or opportunity to be present at any classification or reclassification meetings, proceedings or hearings so Plaintiff was provided no voice in her classification or appeal process. (Testimony of Asst. Warden Sides, Ex. 5X).

31. Defendants provided written documentation that the override was based upon "medical issues" and during trial also stated that it was for safety issues of inmates, guards and Plaintiff as well as lack of reliable background information on Plaintiff.

32. Plaintiff's background information regarding identification, past criminal history, and family history proved to be unverifiable. All seven social security numbers provided by Plaintiff were either invalid or assigned to other unassociated persons. The identification issue remained an issue and concern throughout Plaintiff's period of incarceration. The Plaintiff apparently was abandoned by her natural parents at birth and was raised in foster homes and institutions. According to the Plaintiff, her identity was often changed due to members of the community discovering her gender issue and her wanting the public to not judge her by her physical characteristics.

33. Plaintiff was fingerprinted and a background check showed no positive identification for past criminal activity.

34. Plaintiff was reclassified every ninety (90) days after the initial classification on September 15, 2000, December 21, 2000, March 15, 2001, and on June 28, 2001 without a hearing (Exs. 2–5). Each of the Reclassification Instruments classify Plaintiff as the lowest, minimum security risk, however, each classification was overridden by Laura Lee Crawford to "Close/Restricted" for three reasons: Medical, Program Need and Other. The documents stated: "Inmate DiMarco, based on medical testing has been determined to be a male and therefore requires housing separate from any other inmates."

35. All of the four reclassification instruments state the exact same reason for the override and not one of the four documents was approved or signed by the Classification Supervisor. The reclassification was apparently done by note or routine, without a hearing and without any (or very little) thought; and once initially classified as "Close/Restricted," that's what she remained. A Final Custody Level was never circled since the document was never signed by either the Warden or Deputy Warden at WWC. However, WWC policy requires only the Warden and Deputy Warden had the authority to override a classification or a reclassification.

36. Plaintiff made repeated requests to her caseworker, Laura Lee Crawford, to be transferred to a less restrictive housing environment, and the prison administration was aware of the desired transfer out of Pod 3. (Ex. 14,20, 30,40,C,L–8,L–22,L–23).

37. Defendant Blackburn sought guidance from psychiatrist Bruce Kahn, M.C. regarding Plaintiff's needs and placement within the WWC. Dr. Kahn in his June 6, 2000 report stated:

In view of Ms. DiMarco's complicated psychiatric status, the problematic nature of her incarceration, and the limited mental health resources available in the prison setting, I would recommend the following:

1. Transfer to the Wyoming State Hospital forensic unit for more thorough monitoring, evaluation and treatment than what can be provided in prison.

2. Urological consultation

3. Review of all the collateral criminal justice, medical, surgical and psychiatric records that are reasonably accessible.

4. For as long as she remains imprisoned in a full-service correctional facility, continued housing separate from the general population.

5. No special suicide precautions are currently indicated.

6. No changes in her psychotropic medication.

7. A complete battery of psychological testing is indicated to help better delineate Ms. DiMarco's psychopathology, which could help better define her treatment and placement needs.

8. Intensive psychotherapy

9. Frequent psychotherapy

10. Consider re-sentencing as a male suffering from a Gender Identity Disorder.

11. Intensive chemical dependency treatment.

(Ex. 38, Kahn's report).

38. Plaintiff was initially examined by Carlton Huitt, M.D., the WWC physician, who noted the presence of a penis, no testicles, no scarring in the genital area, no evidence of external female genitalia and the presence of a prostate. A later ultrasound examination revealed no female reproductive organs internally.

39. Dr. Kahn and Dr. Matthew Taylor concluded that Plaintiff is not sexually functional as a male. It was also Dr. Huitt's opinion that Plaintiff was not able to sexually function as a male.

40. On June 6, 2000, Defendant Warden Nola Blackburn wrote to Jill Watson, Wyoming Department of Corrections Prison Division Administrator seeking guidance and assistance in dealing with the housing issues presented by Plaintiff. "I request further guidance from yourself, Director Uphoff and our legal representative regarding this inmate.... If inmate Timm–DeMarco [2] does not receive a sentence reduction ... I anticipate legal action could be brought to bear." (Ex. 43, p. 2–3). The letter continued "obviously this inmate went before the Judge as a female. A change of venue may be in order or a sentence to ISP as the inmate's crime is not violent etc. I am concerned and awaiting yours and the Director's guidance and direction regarding the above stated questions/issues." (Ex. 43, p. 4).

41. There was no written response from anyone in the Wyoming Department of Corrections to Warden Blackburn's request for guidance and assistance although she testified she received verbal approval of her actions some three weeks afterwards. The people in the Cheyenne Office of Corrections apparently put their heads in the sand on this issue, and let Defendant Warden Blackburn tough it out on her own.

42. On August 16, 2000, at the Warden's behest, Plaintiff was included into two psychological groups. Plaintiff was involved with a group led by Dr. Tori Towers and another group led by Mr. Leon Chamberlain. Both groups met once a week.

---

**2.** Plaintiff was referred to as Inmate Miki Timm–DiMarco while in prison as Timm was her third husband's surname. Plaintiff has dropped Timm from her last name. Warden Blackburn misspelled Inmate DiMarco's last name in letter.

43. Plaintiff received individual sessions on a weekly basis from Dr. Tori Towers from August 2000, to January, 2001, and received monthly visits from Bruce Kahn, M.D.

44. Plaintiff had frequent contact with Laurie Lee Crawford, caseworker, on an informal and formal basis to discuss concerns of Plaintiff.

45. Plaintiff was written up for being involved in verbal communications with other inmates in her pod. Apparently, "Close/Restricted" also mandate complete silence among the fellow inmates, even though the general inmate population was allowed to talk to each other.

46. At trial, Defendants verbally indicated that Plaintiff was housed in Pod 3 to protect her from other inmates, as well as to protect other inmates from her.

47. Defendants have a procedure in place designed for the protection of inmates in the form of Policy No. 3.304, Section 3.3, Part III, Title: Protective Custody. (Ex. 11). Defendants failed to follow the Conditions of Protective Custody by failing to allow any property allowances governed by WDOC policy and procedures 3.006, Property Control. (See Ex. 11, p. 4, Section D). In addition, under the Protection Custody Policy, Plaintiff would have also received a far more comprehensive housing review. (See Ex. 11, p. 2, Section E). Instead of classifying Plaintiff as Protective Custody, they selected to use "Closed/Restricted."

48. There is no appellate or grievance procedure from a custody classification decision at WWC. (Ex. 5X).

### Analysis and Conclusions of Law

### I. Plaintiff's First Claim for Relief: Eighth Amendment.

1. Plaintiff claims that her placement by Defendants, solely because of the condition and status of ambiguous gender, in solitary isolation with concomitant severely limited privileges was an unjustifiable, unreasonable incarceration in bad faith and was a violation of the Eighth Amendment prohibition against cruel and unusual punishment. (Pl.'s Verified Amend. Compl., ¶ 47).

2. The Eighth Amendment prohibits States from inflicting cruel and unusual punishment on those convicted of crimes within their jurisdictions. U.S. Const. amend. VIII; *Perkins v. Kan. Dep't of Corr.*, 165 F.3d 803, 809 (10th Cir.1999).

3. Plaintiff claims her incarceration in segregated confinement for a period of 438 days was unnecessarily rigorous, inhumane, and a violation of her constitutional rights under Art. 1, Sec. 16 of the Wyoming Constitution. (Pl.'s Verified Amended Compl., ¶¶ 43, 44).

4. The Wyoming Constitution guarantees any person in jail to be treated with unnecessary rigor and requires the humane treatment of prisoners. Wyo. Const. Art. 1, § 16.

5. The Eighth Amendment requires that prison officials "provide humane conditions of confinement by ensuring inmates receive the basic necessities of adequate food, clothing, shelter, and medical care and by taking reasonable measures to guarantee the inmates' safety." *Craig v. Eberly*, 164 F.3d 490, 495 (10th Cir.1998) (quoting *Barney v. Pulsipher*, 143 F.3d 1299, 1310 (10th Cir.1998)).

6. To hold a jailer personally liable for violating an inmate's right to humane conditions of confinement, a plaintiff must satisfy two requirements, consisting of an objective and subjective component. *Craig*, 164 F.3d at 495. The objective component requires that the alleged deprivation be "sufficiently serious." *Id.* (quoting *Wilson v. Seiter*, 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)).

7. What constitutes cruel and unusual punishment under the Eighth Amendment "must draw its meaning from the evolving standards of decency that mark the progress of a maturing society," however the Constitution "does not mandate comfortable prisons." *Craig*, 164 F.3d at 495 (quoting *Rhodes v. Chapman*, 452 U.S. 337, 346, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981)).

■ 8. Jail conditions may be "restrictive and even harsh" without violating constitutional rights. *Craig*, 164 F.3d at 495 (citing *Barney*, 143 F.3d at 1311). "Only those deprivations denying the minimal civilized measure of life's necessities ... are sufficiently grave to form the basis of an Eighth Amendment violation." *Id.* (quoting *Wilson*, 501 U.S. at 298, 111 S.Ct. 2321); accord *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

■ 9. A claim involving numerous alleged inhumane conditions, such as the case at hand, the various conditions may establish an Eighth Amendment violation " 'in combination' when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise." *Craig*, 164 F.3d at 495 (citing *Wilson*, 501 U.S. at 304, 111 S.Ct. 2321).

10. Under the subjective component, the prison official must have violated the plaintiff's constitutional rights with a "sufficiently culpable state of mind," which means the prison official was deliberately indifferent to the inmate's health or safety. *Craig*, 164 F.3d at 495. The infliction of psychological pain can violate the Eighth Amendment. *Perkins*, 165 F.3d at 810. 11. In *Perkins*, the issue was whether forcing an inmate who was HIV positive to wear a face mask violated his Eighth Amendment rights because of the psychological pain and not any physical pain. The Tenth Circuit gave examples of to what extreme a prison may have violated an inmates Eighth Amendment rights through infliction of psychological pain: disseminating "humiliating but penologically irrelevant details of a prisoner's medical history," or "branding or tattooing HIV-positive inmates ... or making them wear a sign around their neck that read 'I AM AN AIDS CARRIER!' " *Id.*, 165 F.3d at 810.

■ 12. Neither party, nor the Court, was able to find any cases involving an Eighth Amendment claim or violation and an intersexual inmate.

13. Plaintiff was compelled to serve her entire fourteen months in segregated confinement which was at least as rigorous as the punishment reserved for seriously violent prisoners. During the Court's tour of the WWC, the Court noticed an astonishing difference between the almost dormitory style housing quarters for the general population in the West wing and the stark, almost dungeon-like housing quarters in Pod 3 of the East wing. The West wing has pleasing brick walls, not painted concrete block, which was chipped and scraped; it has carpeted halls, not bare cement; it has day rooms with overstuffed comfortable chairs and even ottomans, not a bare area with a steel table and a steel bench, bolted to the floor, which serves as a day room; it has wooden doors on cells of inmates, not solid steel doors with a small window which has a grate covering a large portion of the view; and its inmates have personal possessions and their clothes in a type of dresser, which Pod 3 doesn't have.

14. This Court understands that administrative segregation was necessary for the safety of both the inmates and Plaintiff but questions whether or not less harsh alternatives were available to the WWC staff. Warden Nola Blackburn, early in Plaintiff's incarceration, asked the Wyoming State Department of Corrections for

assistance in finding an alternative housing arrangement and realized the chance of legal repercussions as a result of making no change to Plaintiff's housing assignment, to which the State office did nothing.

15. However, analyzing the Supreme Court and Tenth Circuit holdings on Eighth Amendment claims by prisoners leads this Court to an inquiry as to what, if any, deprivation of the minimal civilized measure of life's necessities has occurred in the case at hand.

16. Plaintiff testified that she received three meals a day and her meals were the same as those served to the general population. She had her own 9 by 12 cell which was clean, well lit by both sunlight and electrical lighting, and had a sink and toilet. Her bedding and clothes were washed on a regular basis. She was provided soap, shampoo, toothpaste and a toothbrush. She was never denied access to medical treatment by either physicians or the nursing staff. Plaintiff had access to and attended psychological groups and had individual counseling sessions. Plaintiff had access, even though very limited, to the gymnasium and the outside courtyard. She was allowed out of her cell and into the "day room" which was a little larger than a couple of cells taken together for five and half hours a day. However, due to meal time and other times when the Pod had to be locked down, this time was often shortened. Plaintiff also had access to legal counsel and visitor privileges.

17. In light of the Tenth Circuit's holding of what is expected of the prison system in order to be in compliance with the Eighth Amendment which is to "provide humane conditions of confinement by ensuring inmates receive the basic necessities of adequate food, clothing, shelter, and medical care and by taking reasonable measures to guarantee the inmates' safety," *Craig*, 164 F.3d at 495 (quoting *Barney*, 143 F.3d at 1310) this Court finds that Defendants did provide Plaintiff's basic necessities.

18. Defendants were presented with a situation of an inmate who was of alleged female gender but was anatomically situated as a male due to the presence of a penis. As all witnesses stated during the trial, no one had been presented with a similar situation, including Dr. Helman, Plaintiff's expert witness who had 27 years in the federal prison experience. A prison official may be held liable under the Eighth Amendment for acting with "deliberate indifference" to an inmate's health or safety only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it. *Farmer*, 511 U.S. at 832–851, 114 S.Ct. 1970.

19. WWC officials and employees had a legitimate reason to believe there was a potential, substantial risk of serious harm to either other WWC inmates or Plaintiff due to Plaintiff's physical characteristics. The officials did not disregard these safety concerns and performed their duty to protect the WWC prisoners, including Plaintiff, from violence at the hands of other prisoners. 20. In *Farmer*, an inmate who was a preoperative transsexual which projected feminine characteristics was incarcerated with other males in both the general prison population and in segregation. *See* 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Petitioner was beaten and raped by another inmate after being transferred to a more general population area. *Id.* The gender and physical characteristics present a similar situation to the case at hand and was ignored by prison officials with unfortunate, but predictable results. In order to avoid a similar result as *Farmer*, the WWC prison officials recognized the potential for danger to Plaintiff and other inmates and acted accordingly.

21. This Court understands the prison staff's concerns about the safety of Plaintiff, the safety of the general inmate population and the security needs of the institution in light of a person with male features and a limited and unreliable background information. The potential dangers and the effort to avoid potential problems was undertaken in good faith. Placing an inmate of the opposite gender in a facility like the WWC, where it was reported that ninety percent of its female inmates had been raped, abused or molested by males, mandated separate housing.

22. Taken that the safety of Plaintiff and other inmates was secured by placing Plaintiff in administrative segregation and that Plaintiff was provided the basic necessities of food, shelter, clothing and medical treatment, leads this Court, for the aforementioned reasons, to reluctantly **DENY** Plaintiff's Eighth Amendment claim and find in favor of Defendants. This Court feels that even though the basic necessities of Plaintiff were met, the WDOC, WWC and staff could have originated a better living situation for Plaintiff.

## II. Plaintiff's Second and Third Claim for Relief: 14th Amendment Due Process

23. The Fourteenth Amendment prohibits any State from depriving a person of life, liberty, or property without due process of law. U.S. Const. amend. XIV; *Meachum v. Fano,* 427 U.S. 215, 223, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976); *Chambers v. Colo. Dep't. of Corr.,* 205 F.3d 1237, 1242 (10th Cir.2000). A prisoner's liberty interest may arise either from the Due Process Clause itself or from state law. *Hewitt v. Helms,* 459 U.S. 460, 466, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983); *Chambers,* 205 F.3d at 1242. The Due Process Clause standing alone offers prisoners only a narrow range of protected liberty interests. *Abbott v. McCotter,* 13 F.3d 1439, 1442 (10th Cir.1994).

24. State-created liberty interests are "generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Perkins,* 165 F.3d at 808 (quoting *Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995)). In other words, a decision by prison officials to place an inmate in administrative segregation does not implicate the Due Process Clause unless it is atypical and significant. *Sandin,* 515 U.S. at 486, 115 S.Ct. 2293. Placement in segregation is atypical and significant when it exceeds the punishment of similarly situated inmates in duration or degree of restriction. *Id.*

25. On the procedural due process claim, it should be noted that all of the cases which focus on segregated confinement dealt with disciplinary confinement due to a violation of prison rules and lack of notice, hearing or ability to call witnesses. In the case at hand, Plaintiff's placement in administrative segregation was not as a result of disciplinary problems since Plaintiff had a sound record as an inmate. Placement was for safety reasons only.

26. Plaintiff was denied a hearing on her housing classification assignment which at the WWC is done, pursuant to WWC policy, without a hearing or inmate's input. Defendants, throughout the trial, emphasized that WWC policy did not call for or allow Plaintiff's presence at the housing assignment meetings. However, this Court is concerned and alarmed that the WWC staff did not allow Plaintiff to be involved in solving the housing issue through a hearing. Plaintiff, unlike those involved in a mandatory disciplinary hear-

ing, did not violate prison rules but simply arrived at the WWC with certain physical characteristics that she did not choose. Plaintiff should have been allowed to at least let her thoughts and concerns be heard prior to the WWC's final decision to place Plaintiff in solitary confinement in Pod 3.

27. The duration of segregated confinement is a distinct factor bearing on atypicality and must be carefully considered. "Both the conditions and their duration must be considered, since especially harsh conditions endured for a brief interval and somewhat harsh conditions endured for a prolonged interval might both be atypical." *Welch v. Bartlett,* 196 F.3d 389, 392–93 (2nd Cir.1999).

28. Confinement in Pod 3 of the East wing for 438 days in this Court's judgment is a sufficient departure from the ordinary incidents of prison life and requires due process protections under *Sandin.* Plaintiff's housing for 438 days in segregated confinement is a factor which created a liberty interest for Plaintiff. *Wright v. Coughlin,* 132 F.3d 133, 136 (2nd Cir.1998). Considering Plaintiff was only placed in segregated confinement due to a genetically created ambiguous gender and the WWC had plenty of time to develop other more respectable, less harsh alternatives for Plaintiff, leads this Court to believe Plaintiff's due process rights were violated. The WWC's decision to place Plaintiff in Pod 3 was a rationale choice for the first thirty days while they evaluated housing options and Plaintiff's behavior patterns, but to continue the same placement with no attempts at elevating her living conditions was completely arbitrary and capricious and without a rationale basis.

29. This Court opines that the WWC could have created better housing quarters for Plaintiff during the 438 days Plaintiff was confined in housing usually used for the most dangerous or violent inmates. The housing assignment and separation of Plaintiff from the general population was for a legitimate security reason. The WWC must take its prisoners as they come to it, but to segregate Plaintiff in the starkest, barest, most severe conditions, when she had violated no prison rules was not fair. Granted that segregation for security reasons was desirable, the prison officials didn't need to enforce the segregation as if she were a malefactor of the worse kind. They could have worked more diligently in creating a housing situation more equivalent to those in general population which had a classification of zero. Indeed, when the Court visited the WWC during this trial, it observed that they had made special arrangements for two other WWC prisoners with special needs who were housed in the infirmary area, which wasn't as stark as Pod 3. Of course, the contrast between Pod 3 in the East wing, and the West wing where the general population is housed was startling. There were no amenities like rugs or wooden cell doors or nice overstuffed furniture in day rooms with T.V. sets at a sitting level in Pod 3, but there they were in the West wing. The Plaintiff, for no fault committed by her, was arbitrarily treated differently than the other prisoners.

30. This Court believes WWC could have allowed Plaintiff, who was classified as a minimum risk and had shown no signs of danger to herself or the other inmates, to get hair cuts and eat an occasional meal with the general population or at least eat meals in the open portion of Pod 3 and not be forced to eat on her bed or toilet in her stark cell. Plaintiff also could have been allowed to have other personal items in her cell such as a cassette player or playing cards without creating a safety matter or issues of unequal treatment among the other inmates. In truth, the WWC classi-

fied Plaintiff as "Closed/Restricted," and then enforced this rating to the limit during her entire confinement whereas a little reason and good judgment in lightening up the harsh "Close/Restricted" rules would have served both parties better.

31. Throughout the trial, Defendants stated that the main reason for Plaintiff's housing assignment was for safety concerns, but what Plaintiff was actually in was Protective Custody. Under Protective Custody and pursuant to Prison Policy No. 3.304 Plaintiff should have been given a more complete housing review and could have been allowed more personal property in her cell, like the inmates had in the West wing.

■ 32. Therefore, because her conditions of confinement were an atypical and a significant hardship for the aforementioned reasons, and therefore violated the Plaintiff's rights to due process under the Fourteenth Amendment, Plaintiff's claim of violation of the Fourteenth Amendment Due Process Clause is **GRANTED**. In addition, this Court finds that Plaintiff's Due Process rights were clearly established. All Defendants, as professional corrections officers and officials and charged with knowledge of the law, knew or should have known that placing Plaintiff in segregated confinement for a 438 day period, without a hearing, was a violation of Plaintiff's constitutional right of due process. She was treated neither fairly nor equally. Defendant Blackburn's letter to WDOC, stating that potential legal ramifications may be forthcoming due to Plaintiff's housing situation, provides evidence that both WDOC and WWC's staff and officials knew or should have known of such constitutional violations. Therefore, Defendants are not protected under qualified immunity.

### III. Plaintiff's Fourth Claim for Relief: Fourteenth Amendment Equal Protection.

33. The Equal Protection Clause requires the government to treat similarly situated people alike. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). In order to assert a viable equal protection claim, Plaintiff must make a threshold showing that she was treated differently from others similarly situated. *Barney*, 143 F.3d at 1312.

34. When called upon to analyze a case on equal protection grounds, courts apply one of three standards of review; (1) rational basis, (2) heightened scrutiny, or (3) strict scrutiny. *Cleburne*, 473 U.S. at 440–42, 105 S.Ct. 3249. If the classification does not implicate a suspect class or abridge a fundamental right, the rational-basis test is used. *Id.* An equal protection analysis requires strict scrutiny of a legislative classification only when the classification impermissibly interferes with the exercise of a fundamental right or operates to the peculiar disadvantage of a suspect class. *Gladstone v. Bartlesville Independent Sch. Dist. No. 30*, 66 P.3d 442, 447 (Okla.2003) (quoting *Mass. Bd. of Retirement v. Murgia*, 427 U.S. 307, 312, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976)).

35. The Supreme Court defined a suspect class as one that is "saddled with such disabilities, or subjected to such history of purposeful unequal treatment, or relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process." *Murgia*, 427 U.S. at 313, 96 S.Ct. 2562. Unless a classification warrants some form of heightened review because it jeopardizes the exercise of a fundamental right or categorizes on the basis of an inherently suspect characteristic, the Equal Protection Clause requires only that

the classification rationally further a legitimate state interest. *Cleburne,* 473 U.S. at 440–41, 105 S.Ct. 3249; *Hodel v. Indiana,* 452 U.S. 314, 331, 101 S.Ct. 2376, 69 L.Ed.2d 40 (1981).

36. Plaintiff claims that individuals born with ambiguous gender are members of a quasi-suspect class. However, there has been no proof of a recognized quasi-suspect class presented to this Court and therefore this Court will not place Plaintiff in a constitutionally protected class. This Court has not been shown by Plaintiff that she was saddled with a disability, or is a member of a group which has been subjected to a history of purposeful unequal treatment, or is in such a position of political powerlessness to command extraordinary protection.

37. Plaintiff was not denied a fundamental right [such as the right to vote, the right to interstate travel, rights guaranteed by the First Amendment, the right to procreate or even non-fundamental rights such as food, clothing, shelter, health care or safety]. Therefore, Plaintiff's classification does not implicate a suspect class or disregard a fundamental right and will have to be analyzed under the rational basis test.

38. Under the rational basis test, the Equal Protection Clause requires only that the classification rationally further a legitimate state interest. The decision of the WWC's administration must only bear a rational relation to a legitimate state purpose. *Jacobs, Visconsi & Jacobs, Co. v. City of Lawrence, Kansas,* 927 F.2d 1111, 1119 (10th Cir.1991).

39. This Court finds that no equal protection violation occurred using the rational basis test because Defendants' actions in placing Plaintiff in segregated confinement was rationally related to the legitimate purposes of ensuring the safety of Plaintiff and other inmates and security of the facility. *See Penrod v. Zavaras,* 94 F.3d 1399, 1406 (10th Cir.1996). Therefore, for the aforementioned reasons, Plaintiff's Fourteenth Amendment Claim for a violation of the Equal Protection clause is DENIED.

## IV. Damages for Violation of Plaintiff's Due Process Rights.

40. "Over the centuries the common law of torts has developed a set of rules to implement the principle that a person should be compensated fairly for injuries caused by the violation of [her] legal rights. These rules, defining the elements of damages and the prerequisites for their recovery, provide the appropriate starting point for the inquiry under § 1983 as well." *Carey v. Piphus,* 435 U.S. 247, 257–58, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978). In order to further the purpose of § 1983, the rules governing compensation for injuries caused by the deprivation of constitutional rights should be tailored to the interests protected by the particular right in question. *Id.,* at 258–59, 98 S.Ct. 1042.

41. In *Carey,* the Supreme Court held that if Defendants could prove that the plaintiff would have been treated the same even if a hearing would have been held, then plaintiff would not be entitled to recover damages to compensate plaintiff for injuries. *Id.,* at 260, 98 S.Ct. 1042. An award for damages for injuries that would have occurred anyway would constitute a windfall, rather than compensation to plaintiff. *Id.*

42. "Nominal damages are all that are due upon a showing of a denial of due process without proof of actual damages, as injury cannot be presumed from denial of due process." *Saxner v. Benson,* 727 F.2d 669, 672 (7th Cir.1984)(citing *Carey,* 435 U.S. at 258, 98 S.Ct. 1042).

43. Plaintiff correctly states that damages for unconstitutional confinement

should be calculated based upon the difference between the harsh conditions of isolated, segregated confinement and the conditions that prevailed in the general prison population at WWC. (citing *Furtado v. Bishop,* 604 F.2d 80, 89 (1st Cir.1979).) However, as this Court has noted, the WWC did have a rational concern in the safety and security of Plaintiff, other inmates and the facility due to Plaintiff's ambiguous gender. This Court does not believe Plaintiff could be placed directly into the general population due to her physical attributes combined with the prison's lack of information on Plaintiff. The Court does acknowledge that the WWC could have taken steps to create a better living situation for Plaintiff while continuing to segregate Plaintiff for security and safety reasons.

44. If Plaintiff would have been able to participate in the housing decision meetings, she would have been able to provide housing suggestions but she still would not have been housed with the general population therefore, this Court will not award damages upon the difference between her actual segregated confinement and the general population.

45. In addition, in following *Carey,* this Court will award only nominal or minimal damages to Plaintiff due to the lack of proof of exhibiting damages during trial. Plaintiff's own expert psychologist, Dr. Martha Schilling, testified that Plaintiff was suffering from a myriad of personality disorders prior to her incarceration and that during her 14 months in WWC, there was no noticeable damage. This diagnosis was confirmed by Dr. Towers, the WWC's psychologist. Therefore, Plaintiff failed to show lasting mental or physical damages as a result of Defendants' violation of her constitutional rights.

46. Therefore, this Court **ORDERS** Defendants to pay Plaintiff $1,000 in damages for the Defendants' violation of her Fourteenth Amendment Due Process rights.

47. In addition, this Court **ORDERS** Defendants to pay Plaintiff's reasonable attorney's fees, court costs and expert costs pursuant to 42 U.S.C. § 1988(b)(c). Plaintiff was the "prevailing party" in her claim for violation of the Due Process Clause of the Fourteenth Amendment.

### Conclusion

It is hereby **ORDERED,** for the aforementioned reasons, that Plaintiff's Claims under the Eighth Amendment and the Equal Protection Clause of the Fourteenth Amendment are **DENIED** and Plaintiff's Claims under the Due Process Clause of the Fourteenth Amendment are **GRANTED. IT IS FURTHER ORDERED** that Defendants are to pay Plaintiff's reasonable attorney's fees, court costs and expert costs.

This Court also impresses upon the WWC and WDOC the need to develop a plan and procedures to handle future administrative segregation based upon non-disciplinary issues such as those presented in the case at hand.